**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Peter CUNAG, aka Peter James Martinez, Defendant– Appellant.**

No. 03–50067.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 29, 2004.

Filed Oct. 7, 2004.

William S. Harris, Law Offices of William S. Harris, South Pasadena, CA, for the defendant-appellant.

Pegeen D. Rhyne, Assistant United States Attorney, Los Angeles, CA, for the plaintiff-appellee.

Before: HALL, TROTT, and CALLAHAN, Circuit Judges.

TROTT, Circuit Judge:

Peter Cunag entered a conditional guilty plea to the charge of possessing stolen mail, reserving the right to appeal the denial of his pre-trial motion to suppress evidence. In that motion, Cunag sought to suppress stolen mail seized by police officers from a hotel room which Cunag had procured by registering under a false name, using a dead woman's credit card, and providing admittedly forged authorization and identification documents. The record, which conclusively demonstrates that the hotel manager had taken affirmative steps to repossess the room and to reassert control over it before calling the police and confronting the appellant, fully supports the district court's findings and conclusions that (1) Cunag was not lawfully present in the hotel room because he procured it through fraud, and (2) that he had no reasonable expectation of privacy in it, either objective or subjective, at the time of the disputed search. Thus, we affirm the district court's denial of his motion to suppress the incriminating evidence of his crime.

**1.** The hotel registry denotes that he checked in on November 13, 2001, under the name Nelson Iban. These discrepant facts do not affect the outcome of this appeal.

# I

## BACKGROUND

According to his own testimony at the suppression hearing, on November 12, 2001, Peter Cunag checked into the Home stead Hotel in Glendale, California, under his co-defendant's name, Nelson Aban.[1] Information he gave the hotel included a false address, a false phone number, and a false company name. To pay for the room, he presented a Bank of America credit card in the name of Paciencia Apan, a dead woman. At check-in, the hotel clerk, Miguel Hernandez, told Cunag that he needed proof of his authorization to use Apan's card. Cunag testified that he then left the front desk, proceeded to another location, and knowingly manufactured a fraudulent California Department of Motor Vehicles ("DMV") identification card bearing Apan's name with a man's picture[2] and two notes purporting to be from Apan. The first note was written on the same page as a photocopy of Apan's credit card. It was addressed to Miguel Hernandez from P. Apan and reads:

> Attached herein is a copy of my Mastercard as requested for use of your office.
>
> Thanks,
>
> /s/ Paciencia Apan
>
> P. Apan
>
> 818–388 . . .
>
> Lic. # B981 . . . CA
>
> Note: This is my personal card. We will issue you a corporate one next day.

The second note was also addressed to Hernandez from P. Apan and reads:

**2.** Cunag testified that the photo on the identification was removed from another identification card and that he did not know the individual pictured.

Attached herewith is a copy of my state CA I.D. for your perusal. Accordingly, I am now responsible for charges incurred by Mr. Aban on Room # 320. I will be responsible & hereby authorize "Extended Stays" to charge my Bank of America Mastercard from Nov. 14 to Dec. 12, 2001. The charges will encompass room + tax & phone charges only during those dates.

Thanks,

/s/ Paciencia Apan

11–13–2001

When Cunag returned to the front desk to give the materials to Hernandez, another employee, Don Kim, accepted the materials and completed the registration paperwork. The hotel rented Cunag room 320, giving him two keys. Cunag proceeded to the room, brought in his personal belongings, and apparently stayed overnight.

The next day, when Hernandez saw Cunag's unusual authorization materials, he notified the hotel manager, Rafael Llamas, that they were "irregular." Llamas examined the documents and noticed that the DMV identification looked fake and that the spelling of the name on the credit card did not match the spelling of the name on the DMV identification. He then personally contacted the DMV and was told that the DMV identification was a forgery. He also had Hernandez contact the Bank of America. The Bank told Hernandez that the address on the DMV identification did not match the address on Apan's account. The Bank attempted to contact Apan. When it could not reach her at her listed telephone numbers, the Bank informed the hotel that it had placed a "lock" on the credit card, making it unavailable as a source of payment for the room.

Based on his prior experiences, Llamas suspected credit card fraud, locked Cunag out of the room, and notified the Glendale Police Department in order to make a crime report. Three police officers soon arrived, and when the manager discovered to his surprise that someone was in the room even though the occupants had been locked out, the police accompanied Llamas at his request to room 320.

Llamas knocked on the door and no one answered. About 30 seconds later, he knocked again. Cunag and his associates had been inside smoking methamphetamine before they heard the knock, as they had been doing off and on since Cunag booked the room. After the second knock, Cunag opened the door, and Llamas said that he would like to discuss the bill. At this point, Officer Anis of the Glendale Police Department smelled a "strong odor of smoke coming from the room" and "became concerned that there was a fire in the room." He stepped forward to see if indeed there was a fire, and Cunag responded by quickly trying to close the door. The officer persisted and removed Cunag from the room. Cunag was detained in the hallway while the officers entered the room. The other two inhabitants were also removed from the hotel room, and all three were handcuffed. In the room, the officers observed a red hot burner on the room's stove and evidence that the occupants had been burning tissue. As the officers were checking for a fire, they found stolen mail in plain view in the bathroom, on the bed, on the kitchen counter, and in a number of travel bags.

The precise evidence presented to the district court by the government was in the form of declarations submitted by, *inter alia*, Officer Anis and manager Rafael Llamas. We begin with an excerpt from the manager's declaration.

6. Based on my experience in dealing with prior fraudulent credit cards and based on the irregularities in the paperwork for room 320, I believed that the

people who had checked into room 320 were using a fraudulent credit card and that the hotel would ultimately not be paid for the expenses charged on this card.

7. *I called the police to report this suspected fraud.* Shortly after, a female officer arrived at the hotel. While I was discussing the situation with her, *one of the hotel employees informed us that two of the people who were staying in room 320 had returned.* The female officer called for backup.

6.[sic] More officers arrived about five to ten minutes later. *When I was speaking to these officers at the front desk, I believed that the two people staying in room 320 had gotten back into the room* because the hotel is not large and they had not returned to the front desk. I believe I said something to the officers like, "I think they're in the room. *There must have been somebody else in the room because they were locked out of the room.*" During this conversation, I told the officers that I wanted to speak to the people in room 320 about payment for the room.

7.[sic] I went up to room 320 with the officers. I knocked on the door. When there was no response, I knocked again. An older man opened the door wide enough for me to see his whole face. *I smelled a strong, chemically [sic] odor of smoke coming from the room.*

8. One of the officers asked me to step away from the door. As I was walking away, I saw the officer enter the room. *It appeared to me that the man in the room was trying to close the door* and the officer was pushing it open. I could see a smokey haze entering the hallway from room 320.

9. I left the hallway and went downstairs. I did not return to room 320 until after the fire department had arrived. When I went back to room 320, I saw that a large fan belonging to the hotel had been placed in the hallway outside room 320 to blow the smoke away.

(emphasis added).

Officer Anis of the Glendale Police Department offered this information in his declaration, which covers the facts that (1) the hotel filed a crime report alleging fraud, (2) the hotel had locked the occupants out of the room, (3) the hotel was surprised to discover that somehow the occupants had regained entry, and (4) he took no action until Cunag attempted to close the door in his face after he smelled smoke and feared a fire.

4. Mr. Llamas further informed me that after he reviewed the paperwork at approximately 12:30 p.m. on November 14, 2001, he phoned the DMV to verify the information on the driver's license. The DMV informed Mr. Llamas that the number on the driver's license, B9811778, did not belong to Pasciencia Apan and that the license must be a forged document. Mr. Llamas then directed one of the other hotel employees to call the Bank of America to verify the credit card amount provided by the suspect. Bank of America confirmed that the account existed, but that they were unable to reach the account holder at the phone numbers on record. The Bank of America employee then stated that he was putting a lock on the account so that the card could not be used.

5. Mr. Llamas further informed me that, based on the above information and based on his own experience as a victim of credit card fraud, he concluded that the man who checked into the hotel as Nelson Iban gave the hotel a fraudulent credit card and that the hotel would not receive payment for the room. *As a result, Mr. Llamas informed me that*

*the occupants of room 320 had been locked out by the hotel.*

6. While we were speaking, at approximately 1:30 p.m., Mr. Llamas noticed that the phone in room 320 was being used at that time, suggesting that they [sic] occupants had gotten into the room. *Mr. Llamas was surprised because he believed they had been locked out of the room.*

7. At approximately 1:40 p.m., I went to room 320 with Mr. Llamas, Sergeant Osborne and Officer Abrahamian. Mr. Llamas knocked on the door. After about thirty seconds with no response, Mr. Llamas knocked again. When Peter Cunag opened the door, I smelled a strong odor of smoke coming from the room and became concerned that there was a fire in the room. *When I stepped forward to see if there was a fire, Mr. Cunag stepped back and quickly tried to close the door.* I pushed the door open and saw that the air in the room was filled with smoke.

8. Based on my training and experience, I know that hotel rooms are sometimes used by criminals as chemical labs which are very dangerous because of the extreme fire hazards they present. Accordingly, I was very concerned about the possibility of fire and about the safety of my officers and the civilians in the hotel.

9. I grabbed Mr. Cunag and handed him to Sergeant Osborne in the hall. At the same time, I saw another individual by the stove in the room who was holding what looked like a string. This individual hurried from the kitchen to the bedroom, and I chased him into the bedroom and pulled him out into the hallway. A third individual was in the bathroom and Sergeant Osborne brought him out into the hallway. The three individuals were then handcuffed for officer safety reasons.

10. Once the three occupants were out of the room, I checked the room for the source of the smoke. In the kitchen, I discovered that one of the stove's electrical burners was on and was red hot, but nothing was on it. I then looked in the living room trash can to see if anything inside was burning. At the top of the trash inside the can, I saw several envelopes from the state controller's officer. As Sergeant Osborne continued to look for the source of the smoke, I called the fire department. During our search, we found that nothing was on fire, but it appeared that tissues had been burned on the stove because rolled tissues were on the floor next to the stove.

(emphasis added).

At the conclusion of the hearing on the motion to suppress, the district court made findings of fact regarding Cunag's credibility. The court said:

I have considered the testimony of Mr. Cunag. I have considered his declaration and supplemental declaration. Of course, his testimony includes not only his direct testimony and redirect testimony, but also all of the testimony and cross-examination as well as his answers in response to the Court's questioning.

I have observed the demeanor and manner of the defendant while testifying. I have considered the reasonable inferences that may be drawn from the evidence in this case including, but not limited to, his testimony; that is, some of the documentary evidence and exhibits in this case.

In all honesty, my reaction is that Mr. Cunag's testimony is farfetched at best. It is something which is totally not deserving of any belief or credibility.

As to Cunag's intent from the moment he first walked through the door of the hotel, the court said:

> All of this betrays what I find to have been the fact that his true intent, that is, he knew he had a credit card that didn't belong to him. He knew he had no authorization to use the credit card from anybody, much less the cardholder because she was already dead; and he, through misstatements, lies, fraud, forgery, obtained the use of that room.

Regarding Cunag's subjective intent, the court found as follows:

> In fact, I find as a matter of fact that he didn't even have a subjective belief that he should have any reasonable expectation of privacy because he knew full well the only reason he was in that room was because he got in there by fraud.

As for the court's final conclusion, the court said:

> But be that as it may, I conclude as a matter of law that Mr. Cunag had no reasonable expectation of privacy in the room, and therefore he has no ability to complain about any searches of that room other than perhaps the closed containers which belonged to him.

## II

## DISCUSSION

### A. Standard of Review

We review the denial of Cunag's motion to suppress de novo, and the underlying factual findings for clear error. *United States v. Jones,* 286 F.3d 1146, 1150 (9th Cir.2002).

### B. Analysis

 The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. CONST. amend. IV.

Whether Cunag had a Fourth Amendment privacy interest in room 320 depends upon whether he had "a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (citing *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). According to the Supreme Court:

> Since the decision in *Katz v. United States,* it has been the law that "capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." A subjective expectation of privacy is legitimate if it is " 'one that society is prepared to recognize as "reasonable." ' "

*Minnesota v. Olson,* 495 U.S. 91, 95–6, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (internal citations omitted) (citing *Rakas,* 439 U.S. at 143, 99 S.Ct. 421).

In *Rakas,* the Supreme Court elucidated the principle that when an individual is not legitimately on the premises, he does not enjoy the protection afforded by the Fourth Amendment. *Rakas,* 439 U.S. at 141 n. 9, 99 S.Ct. 421 (noting that the exclusionary rule *"would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched "*) (quoting *Jones v. United States,* 362 U.S. 257, 267, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)) (emphasis in *Rakas* ). The Court noted, "[w]e would not wish to be understood as saying that legitimate presence on the premises is irrelevant to one's expectation of privacy, but it cannot be deemed controlling." *Id.* at 148, 99 S.Ct. 421.

To illustrate this principle, the Court used the example of a "burglar plying his trade in a summer cabin during the off season." *Rakas,* 439 U.S. at 143 n. 12, 99

S.Ct. 421. The Court noted that while the burglar might not expect to be discovered, he does not enjoy a Fourth Amendment privacy interest in the summer cabin. *Id.* ("a 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered"). Though Cunag argues to the contrary, that example resonates with this case. Like the burglar, Cunag unlawfully gained entry to the premises. Like the burglar, he hoped and believed he might not get caught. But, like the burglar, those hopes and beliefs do not give rise to a legitimate expectation of privacy that society is willing to recognize.

Prior to *Rakas,* the Ninth Circuit mistakenly held that the driver of a stolen car enjoyed the protection of the Fourth Amendment in a search of the car. *Cotton v. United States,* 371 F.2d 385 (9th Cir. 1967). In *Rakas,* the Supreme Court specifically denounced our holding in *Cotton,* noting that "several lower courts inexplicably have held that a person present in a stolen automobile at the time of a search may object to the lawfulness of the search of the automobile." *Rakas,* 439 U.S. at 141 n. 9, 99 S.Ct. 421 (citing *Cotton,* 371 F.2d 385).

Here, we confront a situation that parallels *Cotton.* Cunag procured this room through deliberate and calculated fraud. Like the driver of the stolen car, Cunag was not a lawful occupant. He admitted that when hotel personnel asked him to provide his authorization from the cardholder, he forged two notes including the signatures of a dead woman, and then manufactured a fraudulent California DMV identification card in response to the request. Even if we were to believe Cunag's concocted story that he was authorized to use then-deceased Paciencia Apan's credit card, it is not the story he presented to the managers in order to procure the

room. Rather—as the district court found and as the clear, uncontested evidence demonstrates—he used fraud. During the suppression hearing, through documentary evidence, declarations of the hotel manager, and cross-examination of Cunag himself, the prosecution easily carried its burden to prove that Cunag was unlawfully in the room. *See United States v. Matlock,* 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (noting that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence"). The fact that to some degree the hotel temporarily succumbed to Cunag's fraud, by accepting the card, does not alter the answer to the question of whether he was legitimately on the premises.

Cunag's arguments that the card was still valid and that he was authorized to use it are also belied by the record. The district court understandably found these claims incredible. The court ruled that "[Cunag] knew he had no authorization to use the credit card from anybody, much less the cardholder because she was already dead; and he, through misstatements, lies, fraud, [and] forgery[ ] obtained the use of that room." The court also noted that "even if we accept ... that [Cunag] had authorization from the brother, the fact of the matter is that he still lied and gave false pretenses to the hotel clerk by claiming to have had authorization from the decedent." We agree. Cunag's bizarre claim that Apan's brother "inherited" the decedent Apan's card and authorized Cunag to use it is not supported by any evidence. In fact, Cunag explained at the suppression hearing that he felt the hotel would not likely rent the room based on that story, so he manufactured authorization directly from the dead woman.

Furthermore, Cunag's omissions and inconsistencies bolster the district court's

finding that his testimony was "farfetched at best" and "totally not deserving of any belief or credibility." The district court's factual finding, that Cunag obtained the room through fraud, is fully supported by the record, as is the court's finding that he did not have a subjective belief that he had a reasonable expectation of privacy in the habitation.

 Nevertheless, in the Ninth Circuit, the rule is that even if the occupant of a hotel room has procured that room by fraud, the occupant's protected Fourth Amendment expectation of privacy is not finally extinguished until the hotel justifiably takes "affirmative steps to repossess the room." *See United States v. Dorais,* 241 F.3d 1124, 1128 (9th Cir.2001) (holding that "mere expiration of the rental period, in the absence of affirmative acts of repossession by the lessor, does not automatically end a lessee's expectations of privacy"); *United States v. Bautista,* 362 F.3d 584, 586 (9th Cir.2004) (holding that a hotel patron maintained Fourth Amendment protection "in the face of an *unconfirmed* report that a stolen credit card number was used to reserve the room" because the hotel had not taken affirmative steps toward repossessing the room) (emphasis added).

*Bautista* held that whether a hotel patron retains a reasonable expectation of privacy in his hotel room depends on "whether or not management had justifiably terminated [the patron's] control of the room through private acts of dominion." *Id.* at 590. This general rule had been previously applied in our Circuit in *United States v. Huffhines,* 967 F.2d 314, 318 (9th Cir.1992); *United States v. Haddad,* 558 F.2d 968, 975 (9th Cir.1997); and *United State v. Poulsen,* 41 F.3d 1330, 1336–1337 (9th Cir.1994). As summed up in *Dorais,* a justifiable "affirmative act of repossession by the lessor" is the factor

that finally obliterates any cognizable expectation of privacy a lessee might have. 241 F.3d at 1129.

We conclude on this record that the Homestead Hotel and its manager and agents took justifiable affirmative steps to repossess room 320 and to assert dominion and control over it when they discovered and confirmed that Cunag had procured occupancy by criminal fraud and deceit. Locking out Cunag and the room's occupants in conjunction with registering a crime report with the police certainly satisfies the *Dorais* test. Moreover, the manager of the hotel neither asked the police to search the room, nor were the police asked to evict the occupants when the manager discovered that notwithstanding the hotel's efforts to lock Cunag and his cohorts out, they had somehow regained entry. The manager simply asked the police to accompany him while he confronted the putative felons in room 320. Nothing in the Fourth Amendment prohibited the police from going to room 320 with the manager, and nothing prohibited the manager from knocking on the door.

Furthermore, the police took no action regarding room 320 until smelling smoke, fearing fire, and observing a man they had probable cause to arrest for a felony close the door in their face. What the police did when they were confronted with this set of facts and circumstances was manifestly reasonable under any measurement; and what they found in plain view in the smoke-filled room was clearly admissible as evidence against this appellant.

### III

### CONCLUSION

Cunag procured this (non-smoking) hotel room, his perceived safe haven for smoking methamphetamine and sorting through pilfered mail, through fraud. On

this record, the trial court's rulings that Cunag lacked credibility and that he harbored no subjective legitimate expectation of privacy appear unassailable. Accordingly, we affirm the denial of Cunag's motion to suppress. Cunag never lawfully occupied the hotel room, the hotel reclaimed it before the entry took place, and he had no protected Fourth Amendment protection in it at the time of the incriminating search.

**AFFIRMED.**