# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellant,*

v.

MICHAEL YOUNG,
    *Defendant-Appellee.*

No. 07-10541

D.C. No.
CR-07-00559-JSW

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted
November 18, 2008—San Francisco, California

Filed July 14, 2009

Before: Alfred T. Goodwin, Andrew J. Kleinfeld and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Goodwin;
Dissent by Judge Ikuta

8733

## COUNSEL

Allison Marston-Danner, Assistant United States Attorney, San Francisco, California, for the plaintiff-appellant.

Elizabeth M. Falk, Assistant Federal Public Defender, San Francisco, California, for the defendant-appellee.

## OPINION

GOODWIN, Circuit Judge:

The Government appeals the district court's suppression of evidence, including a firearm, from Michael Young's hotel room, as fruit of a warrantless search and seizure. After realizing Young had accidentally been given a key to another hotel guest's room, the hotel staff entered Young's room, during his absence from the room, to search for belongings reported missing. The staff uncovered a firearm in a backpack in Young's room, but none of the missing items. Young was temporarily locked out of his room, with all of his belongings left in the room, including the firearm. Young returned to his room only to find that his key no longer opened the room. He contacted hotel staff, who called the police, but did not tell Young that he was evicted or would not be allowed back in his room. A San Francisco Police Department (SFPD) officer arrived and spoke with Young, and then accompanied hotel staff to Young's room, at which point the staff opened Young's room and unzipped the backpack so that the firearm was in plain view of the officer. The officer arrested Young for being a felon-in-possession.

In the proceedings before the district court, Young argued that the fruits of the search should be suppressed because the search violated the Fourth Amendment. The district court agreed and granted the motion to suppress the firearm and any other evidence found in the room, while denying without prejudice the motion to suppress statements made by Young.

The Government brings this appeal, arguing that Young did not have a reasonable expectation of privacy in the room

because hotel staff had evicted him prior to the warrantless search. Alternatively, the Government argues that the search should not be found unlawful because it did not exceed the scope of the private search by the hotel staff that had occurred earlier. Finally, the Government posits that even if Young retained an expectation of privacy in the room and the police search was unlawful, reversal is necessary here because the firearm falls under the inevitable discovery exception. We have jurisdiction under 18 U.S.C. § 3731 and hold that because the hotel did not actually evict Young, he maintained a reasonable expectation of privacy in his hotel room . We therefore AFFIRM the district court's order granting the motion to suppress.

## I.   BACKGROUND

During the early evening of August 5, 2007, James Johnson, a guest at the Hilton Hotel in San Francisco who was staying in Room 13572, reported the theft of a laptop computer, iPod, and assorted other items from his room. Dirk Carr, the Hilton's Assistant Director of Security, was on duty at the time and while reviewing hotel records, found that defendant Michael Young had mistakenly been registered to and given a key to Johnson's room. Carr subsequently called Young on his hotel room phone in Room 13575, asked Young what room he was staying in (Young responded Room 13575), and then asked Young if he could come up and speak to Young later. Young agreed to speak to Carr.

Later that evening, at around 8:30 p.m., Carr went up with Security Supervisor Roger Hicks to both of the rooms in question to look for Johnson's missing property and to speak to Young. Young was not in his room at that time, so Carr and Hicks unlocked Young's room using a master key and found a backpack. Upon opening the backpack, they found checkbooks belonging to other people, as well as a firearm in the front pocket. They also found an empty key package for John-

son's room, Room 13572, on Young's bed. None of John-son's missing belongings were found.

Carr then telephoned Bill Marweg, Security Director of the Hilton, at his home. Marweg told Carr to place the room on electronic lockout (also referred to as being "e-keyed"), thereby preventing Young from being able to access the room when he returned. A room placed on electronic lockout prevents the room from being opened by any key other than the special "electronic lockout" key. According to the Government, this action was consistent with the Hilton's unwritten policy, as described by Marweg in his declaration, of evicting guests believed to have committed a crime in their hotel rooms. Marweg also told Carr to leave the firearm in the room, pursuant to Hilton's policy of its security officers not handling weapons. No one from the Hilton called the police at this time.

Hilton also has a policy that once a weapon is found in a guest's room, the following steps are to be taken:

> Security shall E-key [electronically lock out] the guest room without disturbing the weapon and leave a note out on the door for the guest to call security upon returning to the room . . . [w]hen the guest returns, he/she is to be informed that company policy prohibits possession of weapons on company and/or hotel property and offered a secured location . . . for the storage of such weapons until the time of his/her departure.

Hilton Hotels Corp., Standard Practice Instructions, Part IV.A.3, 9.

At no time was Young informed of the hotel's unwritten policy regarding guests suspected of committing crimes, or its written policy regarding guns in guest rooms. Accordingly, these policies could not affect Young's otherwise reasonable

expectation of privacy in his hotel room and the closed containers stored therein. *See Rakas v. Illinois*, 439 U.S. 128, 143-44 (1978); *Katz v. United States*, 389 U.S. 347, 352 (1967).

At 11:45 p.m. that night, Young returned to the hotel and tried to enter his room, but could not because of the electronic lockout. Hicks was notified that Young had returned, and he then contacted Marweg. At this point, Young did not know he had been locked out by Hilton security; he knew only that his key no longer worked. Marweg told Hicks to call the police, which he did.

SFPD Officer Michael Koniaris was working in the front of the hotel at approximately 12:30 a.m. on August 6, 2007, when Hicks approached Officer Koniaris about Young. Hicks asked Officer Koniaris to detain an individual who was sitting in the lobby. Hicks told Officer Koniaris he believed the individual had committed a burglary in a Hilton hotel room registered to another guest. Officer Koniaris entered the hotel lobby, asked the individual his name, and the individual responded that his name was Michael Young. Officer Koniaris asked Young for his driver's license, which Young then gave to Officer Koniaris. Young was accompanied by another individual, and Young asked Officer Koniaris if the other person was permitted to leave. After Hicks told Officer Koniaris that Young's companion had just arrived at the hotel and was not involved, Officer Koniaris told the companion he was free to go.

Officer Koniaris went outside and ran a warrants and identification check on Young. He found that Young had previously been arrested, on various felony and misdemeanor charges. Officer Koniaris returned to the hotel lobby and spoke to Young for about twenty or thirty minutes in the lobby, discussing family matters and other topics. At no time did Officer Koniaris read Young his *Miranda* rights or indicate to him that he was a suspect. Officer Koniaris asked

Young if he had ever been to prison and Young replied that he had. Shortly after Officer Koniaris's conversation with Young ended, Hicks told Officer Koniaris about the firearm in Young's room.

Officer Koniaris thereupon took Young to the hotel security office, searched Young, and handcuffed him to a bench in the office. Officer Koniaris then called his sergeant to advise him of the situation. The sergeant informed Officer Koniaris that Officer Koniaris could not "enter Young's hotel room to search it," but the sergeant also told him that "Hilton security staff could enter a guest's room."

Officer Koniaris accompanied Carr and Hicks up to Young's room, where one of the security guards opened the door to the room, while Officer Koniaris waited outside in the hallway, in a position where he could see into Young's room. Officer Koniaris watched Hicks remove the backpack from the closet, unzip the front pocket, where the firearm was located, and put the backpack on the bed. This left the firearm visible in plain sight to Officer Koniaris. Officer Koniaris entered the room and seized the backpack and firearm. He proceeded downstairs where he informed Young that he was under arrest for being a felon in possession of a firearm.

About two months after the arrest at the hotel, the Government determined that Young had used a stolen credit card to book his room at the Hilton. At the time of Young's arrest, however, the Hilton staff had no knowledge of the fraudulent credit card usage.

Young was subsequently indicted by the grand jury for possession of a firearm after being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). On September 6, 2007, Young filed a motion to suppress the fruits of the search of his hotel room. On October 26, 2007, the district court held a hearing on Young's motion, and at the conclusion of the hearing, the

judge ruled from the bench, granting the motion. The Government filed its timely notice of appeal.

## II.  DISCUSSION

### A.  Young's Expectation of Privacy

[1] "The Fourth Amendment protection against unreasonable searches and seizures is not limited to one's home, but also extends to such places as hotel or motel rooms." *United States v. Cormier*, 220 F.3d 1103, 1108-09 (9th Cir. 2000). In order to benefit from Fourth Amendment protections, an individual must "demonstrate a subjective expectation that his activities would be private, and he must show that his expectation was 'one that society is prepared to recognize as reasonable.' " *United States Nerber*, 222 F.3d 597, 599 (9th Cir. 2000) (*quoting Bond v. United States*, 529 U.S. 334, 338 (2000)).

[2] Part of what a person purchases when he leases a hotel room is privacy for one's person and one's things. *See United States v. Dorais*, 241 F.3d 1124, 1128 (9th Cir. 2001). Like a lessee of an apartment, a hotel guest does not lose his reasonable expectation of privacy in his hotel room just because he is detained or arrested by a police officer outside of his apartment, or in Young's case, his hotel room. *See Stoner v. California*, 376 U.S. 483, 486-91 & n.4 (1964). A landlord sometimes calls the police with suspicions or accusations against his tenants. The landlord's call to the police on a tenant does not destroy the tenant's right to his tenancy. The same is true here. Being arrested is different from being evicted, and being arrested does not automatically destroy that person's reasonable expectation of privacy in his home. *See id.*; *United States v. Bautista*, 362 F.3d 584, 590 (9th Cir. 2004) (holding that "unless [a hotel guest's] occupancy ha[s] been lawfully terminated when the police conducted their search, [the guest] retain[s] a reasonable expectation of privacy in the room").

**[3]** In *Bautista*, this court explained that whether a hotel guest retains a reasonable expectation of privacy in his room turns on "whether or not management had justifiably terminated [the patron's] control of the room through private acts of dominion." 362 F.3d at 590; *see also Dorais*, 241 F.3d at 1127-28 (holding that a hotel guest did not have a reasonable expectation of privacy after staff had taken "affirmative steps" to evict him). Kevin Bautista had fraudulently procured a motel room using a stolen credit card. *Bautista*, 362 F.3d at 586-87. The motel did not know that Bautista had used a stolen credit card to make the reservation. *Id.* A few days later, after the motel manager was informed of the fraud, she called the police to help her "find out what was going on with Mr. Bautista and the credit card." *Id.* at 587. The manager told the police that if Bautista could not explain the credit card situation to the manager's satisfaction, she was prepared to have the police evict him, unless he could make other payment arrangements. *Id.* The manager gave the officer Bautista's room key, which the officer used to enter the room. *Id.*

We held that at the time of the police entry into the room, Bautista was still the lawful occupant of the room, and was therefore entitled to a reasonable expectation of privacy, and that the search violated the Fourth Amendment. *Id.* at 589-90. "The manager did not ask the police to evict Bautista and the police did not suggest doing so," and under this court's precedent, "unless [a hotel guest's] occupancy ha[s] been lawfully terminated when the police conducted their search, [the guest] retain[s] a reasonable expectation of privacy in the room." *Id.* Until the hotel manager "asked the police to evict Bautista, he was still a lawful occupant who retained a legitimate expectation of privacy in the room." *Id.* at 590. Accordingly, we held that the warrantless search was illegal and vacated the conviction. *Id.* at 593.

**[4]** The circumstances in this case parallel *Bautista*. The district court correctly found that Young maintained a reasonable (although fraudulent) expectation of privacy in his hotel

room and the luggage he left in the hotel room, because hotel staff had not evicted him from the room. The hotel had not taken any affirmative act that was a clear and unambiguous sign of eviction. Upon returning to his room and seeing that his key did not work, Young might reasonably have believed his key to be defective or demagnetized, rather than suspecting that he had been evicted from the room.

Numerous other facts militate against a factual finding that Young had been evicted from his room, including:

- Young was never told by any member of the Hilton security staff that he had been evicted.

- Young's belongings were never removed from his room and placed into storage.

- There was no evidence that Young had been removed from the registered guest list at the hotel at the time of the search.

- Hilton security staff did not contact the police after first discovering the firearm, but instead chose to contact police only after Young returned to his room and found that he had been temporarily locked out.

- At the time of the warrantless search and seizure, both Hilton security staff and Officer Koniaris appeared to consider Young to still be in possession of the room. The security staff repeatedly referred to Room 13575 as "Young's room," and Officer Koniaris told Hicks that his supervisor said that he "could not enter Young's room to search it."

The Government does not dispute the district court's conclusion that Hilton security should be considered state actors for the purposes of the second search of Room 13575.

The Government argues that the district court did not accord adequate weight to a particular sentence in the Marweg Declaration. The relevant sentence states: "It is the policy of the Hilton that guests suspected of committing a crime in the hotel should be evicted from the hotel." Marweg Dec. ¶ 16. However, no such statement exists in the written policies submitted by the Hilton. A policy that something ought to be done does not establish that it was done, and a hotel's confidential policy or manager's suspicions, not disclosed to the defendant, cannot destroy an otherwise reasonable expectation of privacy. *Rakas*, 439 U.S. at 143-44 & n.12.

One portion of Hilton's policy, titled "Suspected unlawful activity," does state that "[i]f the circumstances surrounding a found or observed weapon suggests the potential for unlawful activity, the local police are to be informed by the Director of Safety and Security or the General Manager." But no evidence in the record, including the submitted declarations, indicates that the district court clearly erred in concluding that the hotel was not implementing this portion of the policy. Indeed, if the "suspected unlawful activity" was the cause for the call to the police, the police would have been called *immediately* after the first search by the Hilton security staff while Young was out of the room, instead of *after* he unexpectedly returned to the room.[1]

Despite the unwritten policy, nothing in the record suggests that Hilton security had concluded that Young had committed a crime. The staff knew only that Young had accidentally been given a key to another guest's room (Room 13572), and Marweg's declaration states that the lock interrogation report showed that an unidentified keycard was used to enter that room at 3:30 p.m. — a full 15 minutes before Young was mis-

---

[1]The other portion of the relevant written policy indicates only that once a weapon is found in a guest's room, the room is to be placed on electronic lockout and a note is to be left for the guest to call Security upon his return.

takenly given the key. While Marweg states in his declaration that he believed the time clock on Room 13572's lock to be 20 minutes behind, neither Hicks nor Carr — the two security staff members on duty at the time — indicate in their declarations that they were aware of or considered these facts about the lock interrogation report when they decided to conduct their search of Young's room.

**[5]** Furthermore, Marweg's declaration states that in his experience, guests who steal from the hotel rarely return, and that was his expectation with Young — but Young behaved contrary to this expectation by returning that same night to his room, suggesting that Marweg was now *less* likely to believe Young was a thief. This evidence does not support a conclusion by Hilton security staff that Young had committed room theft or provide grounds to evict Young from his room. Young's return to his room and attempt to enter it are evidence Young still believed he was a guest at the hotel, a reasonable belief given that the hotel had not actually evicted him or told him that he was evicted.

The Government's contention that the Ninth Circuit's earlier decision in *United States v. Cunag*, 386 F.3d 888 (9th Cir. 2004), controls this case also falls short. In *Cunag*, Peter Cunag sought to suppress stolen mail seized by police officers from his fraudulently procured hotel room. *Id.* at 889. At the time of check-in, Cunag provided materials that allegedly authorized his use of another individual's credit card. *Id.* at 890. Upon inspection, hotel staff realized the materials were likely to be forgeries, and contacted the DMV and the credit card's issuing bank, which confirmed Cunag's fraud. *Id.* The hotel manager then locked Cunag out of the room and immediately contacted the police to file a crime report. *Id.* Three police officers arrived at the scene, and accompanied the manager to Cunag's room at the manager's request. The manager knocked several times, and after Cunag opened the door, the manager informed him that he needed to discuss the bill with him. *Id.* One of the officers smelled a "strong odor of smoke

coming from the room" and was concerned that there might be a fire, so he stepped forward to enter the room. *Id.* Cunag responded by trying to close the door, but the officer persisted, pushed forward, and removed Cunag and the other inhabitants from the room. *Id.* The officers subsequently discovered the stolen mail and observed a burner on the room's stove, and evidence that the occupants had been burning tissue. *Id.*

In denying the motion to suppress, the district court considered all the submitted declarations and made findings of fact regarding Cunag's credibility. *Id.* at 892-93. The court found that Cunag's testimony was "farfetched at best," and that he could not have had any reasonable expectation of privacy in the room because he obtained the room through outrageous "misstatements, lies, fraud, forgery." *Id.* at 893.

In affirming, this court held that the district court's finding that Cunag obtained the room through fraud was fully supported by the evidence in the record, as was the finding that Cunag could not have had a subjective belief that he had a reasonable expectation of privacy in the room. *Id.* at 895. The court concluded that the hotel took "justifiable affirmative steps" to repossess the room by "[l]ocking out Cunag . . . in conjunction with registering a crime report with the police certainly satisfies the *Dorais* test." *Id.* Accordingly, the court held that "Cunag never lawfully occupied the hotel room, the hotel reclaimed it before the entry took place, and he had no protected Fourth Amendment protection in it at the time of the incriminating search." *Id.* at 896.

**[6]** Unlike *Bautista*, *Cunag* is inapplicable to the facts presented here. *Cunag* involved a defendant who had been conclusively evicted from his hotel room after hotel management confirmed that the room had been procured through credit card fraud. The lockout was done with the clear intention of permanently removing Cunag from the room, as demonstrated by the simultaneous filing of the crime report with the police.

Here, Young was placed on electronic lockout only as a *temporary* measure, in accordance with the hotel's weapons policy, and hotel management was unaware of the possibility that Young had procured the room through fraud. The district court correctly took note of Hilton's security policy, which states that when a room has been e-keyed and the guest returns, "he or she is to be advised that the room will not be cleaned or serviced while the weapon is left in the room unattended," and then offered a "secured location on company hotel property, if available, for the storage of such weapon until the time of his or her departure." The policy says nothing about evicting a guest whose room is found to contain a weapon.

[7] The Government itself acknowledges that the hotel security staff could have taken affirmative acts of dispossession against defendant, including removing Young's backpack from the room and leaving a note on his door that he had been evicted from the room. After reviewing the written policy and declarations, the district court did not clearly err in holding that the Hilton security guards intended to secure the room for *safety* purposes, not to evict Young, and therefore correctly discredited Marweg's single statement to the contrary. In other words, the intent apparent to Young critically distinguishes *Cunag* from the circumstances before us now. Had the Hilton hotel staff genuinely intended to evict Young from the premises, it would have had to be readily apparent, as demonstrated through removal of Young's belongings from the room, a note left on the door informing Young he had been evicted, the hotel staff telling Young he was evicted, or some combination of the above. None of those events occurred. Nothing in the record suggests that even if the hotel staff had discovered Young's credit card fraud, they would have taken affirmative steps to immediately evict Young from the room, as the staff in *Cunag* did. Instead, it is entirely possible that hotel staff would have followed the course of action chosen by the hotel staff in *Bautista*, where the manager did

not call the police to file a report but instead waited to speak to Bautista to see about alternative forms of payment.

**[8]** Furthermore, Cunag's fraudulent use of the credit card was front and center in that case. The district court held a suppression hearing and heard testimony from officers and from Cunag himself before making the factual finding that Cunag was "totally not deserving of any belief or credibility." *Cunag*, 386 F.3d at 895. This court agreed that *Cunag* did not have a reasonable expectation of privacy in the hotel room after reviewing the district court's factual findings and noting that the hotel, its manager, and agents "took justifiable affirmative steps to repossess room 320 and to assert dominion and control over it when they discovered and confirmed that Cunag had procured occupancy by criminal fraud and deceit." *Id.* Here, the district court acknowledged the possibility of fraud, but correctly distinguished Young's situation from that in *Cunag* by noting that hotel management was completely unaware of such a possibility and that, as a result, the alleged fraud did not destroy Young's expectation of privacy in the room, just as it did not in *Bautista*.

The Sixth Circuit's decision in *United States v. Allen*, 106 F.3d 695 (6th Cir. 1997) also fails to support this appeal. *Allen* involved the search of a hotel room that took place *after* defendant's rental period had expired because of his failure to pay the room rate, and after the motel manager took possession of the room upon discovering that defendant was keeping contraband in the room. 106 F.3d at 699. The Sixth Circuit held that the hotel's repossession of the room extinguished Allen's privacy interest in it, and that the manager's actions were proper, "both because he was not allowed to store illegal drugs on the premises and because his pre-paid rental period had elapsed." *Id.* Neither of those circumstances exist in the case here. At the time of the search, Young's rental period had not elapsed, and the hotel staff had not evicted Young from his room. His privacy interest in the room therefore remained intact.

**[9]** We therefore conclude that Young maintained a reasonable expectation of privacy because he had not been evicted, as required under the *Dorais* test, from the hotel room at the time of the warrantless search.

B.    *United States v. Jacobsen* and the Search of Young's Hotel Room

The Government argues, for the first time on appeal, that *United States v. Jacobsen*, 466 U.S. 109 (1984) should be extended to permit the search of Young's backpack stored in his hotel room.

**[10]** *Jacobsen* involved a Federal Express package that was initially opened and searched by private employees, and after the employees notified authorities that the package contained contraband, authorities then searched and seized the package. 466 U.S. at 121-22. In reversing the Eighth Circuit, the Supreme Court held that "the package could no longer support any expectation of privacy," and that "[s]uch containers may be seized, at least temporarily, without a warrant." *Id.* at 121. The Court based its decision in part on the fact that "the tube and plastic bags contained contraband and little else," and accordingly, the "warrantless search was reasonable, for it is well-settled that it is constitutionally reasonable for law enforcement officials to seize 'effects' that cannot support a justifiable expectation of privacy without a warrant, based on probable cause to believe they contain contraband." *Id.* at 121-22.

**[11]** This language suggests a very restricted application of the holding in *Jacobsen*, and there are no facts presented here that persuade us to expand *Jacobsen*'s decision to warrantless searches of private residences. The Sixth Circuit in *Allen* specifically rejected this line of argument:

Unlike the package in *Jacobsen*, however, which "contained nothing but contraband," Allen's motel

room was a temporary abode containing personal possessions. Allen had a legitimate and significant privacy interest in the contents of his motel room, and this privacy interest was not breached in its entirety merely because the motel management viewed some of those contents. *Jacobsen*, which measured the scope of a private search of a mail package, the entire contents of which were obvious, is distinguishable on its facts . . . .

*Allen*, 106 F.3d at 699; *see also United States v. Paige*, 136 F.3d 1012, 1021 n.11 (5th Cir. 1998) (holding that applying *Jacobsen* to searches of private residences "would make the government the undeserving recipient of considerable private information of a home's contents strictly through the application of an inflexible rule").

**[12]** We agree with the Sixth Circuit's reasoning in *Allen*. It is a crime to possess cocaine, and the package in *Jacobsen* contained "nothing but contraband." 466 U.S. at 120 n.17. This case is distinguishable from *Jacobsen* because neither the hotel room nor the backpack contained only contraband. It is not a crime in most circumstances for a non-felon to possess a gun, and the hotel did not know at the time of its private search that Young was a felon. The hotel could not have been "virtually certain," as the postal workers were in *Jacobsen*, that the gun was contraband, and the closed backpack supported a reasonable expectation of privacy. *Stoner*, 376 U.S. at 490; *Nerber*, 222 F.3d at 600; *see also United States v. Ross*, 456 U.S. 798, 822-23 & n.30-31 (1982). Until a hotel guest's lease of the room expires or he checks out, the room is like a home. *United States v. Jeffers*, 342 U.S. 48, 51-52 (1951). A guest has a legitimate and significant privacy interest in the room's contents, and does not lose his expectation of privacy against unlawful government intrusions into his closed briefcase or the contents of his computer hard drive when hotel staff sees the briefcase, laptop, or other belongings while cleaning the room or changing a light bulb. *See id.*

Closed packages or containers, such as Young's backpack, "are in the general class of effects in which the public at large has a legitimate expectation of privacy," making warrantless searches of them "presumptively unreasonable." *Jacobsen*, 466 U.S. at 114-15. Even in circumstances (none of which were present here) where government agents may lawfully seize a package to prevent loss or destruction of suspected contraband, "the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package." *Id.*; *Johnson v. United States*, 333 U.S. 10, 14 n.14 (1948) ("Belief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause.").

C.   Inevitable Discovery Exception to the Exclusionary Rule

The Government's final argument is that the district court incorrectly applied the exclusionary rule in suppressing the fruits of Officer Koniaris's search because the court failed to consider the viability of the inevitable discovery exception in this case. This doctrine also forms the basis of the dissent.

**[13]** The inevitable discovery doctrine was first recognized by the Supreme Court in *Nix v. Williams*, 467 U.S. 431 (1984). It states that if, "by following routine procedures, the police would inevitably have uncovered the evidence," then the evidence will not be suppressed despite any constitutional violation. *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989).

**[14]** Inevitable discovery does not govern in this case. The government has not shown by a preponderance of the evidence, *see id.* at 1396, that Young would never have been allowed back into his room. The Hilton weapons policy pro-

vides for staff members to carry out the following steps to be taken after a weapon is discovered in a guest's room:

> Immediately leave the guest room, lock the guest room door and notify Security . . . Security shall E-key the guest room without disturbing the weapon and leave a note on the door for the guest to call Security upon returning to the room . . . . When the guest returns, he/she is to be informed that company policy prohibits possession of weapons on company and/or hotel property and offered a secured location on company or hotel property, if available, for the storage of such weapon until the time of his/her departure.

Hilton Hotels Corp., Standard Practice Instructions, Part IV.A.1, 3, 9.

Therefore, assuming that staff had followed the written policy when Young returned to the room, it is entirely likely that after some discussion with hotel security, Young might have decided to store the firearm, or, alternatively, take his belongings with him and vacate the room. Contrary to the dissent, both our circuit precedent and Supreme Court precedent demonstrate that the inevitable discovery exception does not apply. The above facts show that we have a warrantless search of a private residence, not incident to an arrest, by hotel staff working with a police officer. In *Nix*, the Supreme Court held that speculation on the inevitability of legal discovery of evidence is constrained by "demonstrated historical facts capable of ready verification or impeachment." 467 U.S. at 444-45 n.5.

Because the purpose of the inevitable discovery doctrine is related to the harmless error theory, *Nix*, 467 U.S. at 344 n.4, we examine the government's assertion that no warrant was necessary here because the police would have lawfully discovered the challenged evidence in the due course of police

business, no matter what mistakes the hotel staff or the police officer at the hotel actually made. The government argues that because the officer knew, before Young was arrested, that Young had been to prison and because the police had been informed by hotel personnel that Young had a firearm in his room, the officer therefore had probable cause to arrest Young. The government also argues that once Young was arrested and immobilized in the hotel security office, the officer then had not only the right, but the duty, for public safety reasons, to take possession of the firearm, which he had seen in the course of his earlier search of the room. Once the police had possession of the firearm, that possession became lawful because it was inevitable. What is missing from this kind of circular logic is the fact that the police officer could have obtained a warrant — and in fact was informed by his superior officer that he needed a warrant — but instead of getting a warrant, conducted a warrantless search of the room while accompanied by hotel staff. The public safety exception does not apply in this case, however, because the gun was locked in a hotel room accessible only to hotel security staff. *Cf. Jeffers*, 342 U.S. at 51-52; *Johnson*, 333 U.S. at 15. The only reason the police possession of the firearm was inevitable was because the officer did what officers sometimes do — he took a short cut, even in light of the instruction from his sergeant that a search of the room was impermissible.

**[15]** The dissent proposes that we accept Marweg's statement — that weapons belonging to a guest suspected of committing a crime are always turned over to the police — as formal hotel policy, even though nothing in the Hilton's written policy is consistent with Marweg's statement. We decline to do so. The policy states that "[t]he local police are to be notified and requested to come onto company or hotel property and take possession of the weapon" only when a weapon is found in a room *after* a guest has checked out. Young had not checked out, so it was not inevitable under the policy that the gun would be turned over.

In a long line of cases beginning with *United States v. Echegoyen*, 799 F.2d 1271 (9th Cir. 1986), our court has stated in no uncertain terms that "to excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment." *Id.* at 1280 n.7. *See also United States v. Reilly*, 224 F.3d 986 (9th Cir. 2000); *United States v. Mejia*, 69 F.3d 309 (9th Cir. 1995); *United States v. Boatwright*, 822 F.2d 862 (9th Cir. 1987). As we explained in *Mejia*, this court "has never applied the inevitable discovery exception so as to excuse the failure to obtain a search warrant where the police had probable cause but simply did not attempt to obtain a warrant." 69 F.3d at 320.

In the case at bar, nothing more than speculation — not the "demonstrated historical facts capable of ready verification" required by *Nix* — support the discovery of the challenged evidence outside the improper search by Officer Koniaris. According to Officer Koniaris's affidavit, he learned of Young's past arrests and spoke to him for "twenty or thirty minutes" before learning that hotel staff had found a gun in his room. At that point, he and the hotel security officers took Young to the Hilton security office, where Officer Koniaris searched Young and then handcuffed him to the bench in the office. Instead of entering Young's room while accompanied by the hotel security staff, Officer Koniaris should have obtained a search warrant and then returned to search the room. The gun and the other evidence found in the room would then have been admissible against Young.

**[16]** A failure to suppress the evidence here would place the police in a better position than if the illegal search had not occurred. We hold that the inevitable discovery exception does not apply to the search of Young's room and seizure of the firearm and other belongings.

## III.   CONCLUSION

The district court's suppression of the firearm seized from Young's room was consistent with the Fourth Amendment precedent in this circuit. Young maintained a reasonable expectation of privacy in the room.

**AFFIRMED.**

---

IKUTA, Circuit Judge, dissenting:

Even if Young's Fourth Amendment rights were violated when Officer Koniaris observed hotel security staff search the hotel room, the government proved by a preponderance of the evidence before the district court that the gun ultimately would have fallen into police possession. The alleged misconduct was thus harmless under the inevitable discovery exception to the Fourth Amendment's exclusionary rule. I therefore respectfully dissent.

I

The facts before the district court in this case establish that, absent the purported police misconduct, the gun would have come into police possession lawfully. The hotel's search of Young's room was independent, private, and conducted prior to police involvement. After reviewing registration records, the hotel management realized it had mistakenly given Young access to the room from which the laptop computer and other items were stolen. Dirk Carr, Assistant Director of Security at the Hilton Hotel San Francisco, called Young and asked to speak with him. Young agreed, but when Carr and Roger Hicks, the Security Supervisor at the hotel, went to Young's room and knocked on the door, Young did not answer. At that point, Carr and Hicks opened the door with a master key. They found Young's gun in a backpack and an empty key

sleeve (missing the key) nearby with a label matching the number of the burgled room. Carr called William Marweg, Director of Security and Safety at the hotel, for instructions. Marweg told Carr to leave the gun in the room and to place it on electronic lockout (meaning Young could not reenter), actions consistent with hotel policy.[1] Given the late hour, Marweg told Carr to call the San Francisco Police Department in the morning to inform it of the theft and the discovery of the gun. Marweg testified that, in his experience, "individuals who steal items from the hotel do not then return to the hotel."

Curiously, Young returned to the hotel later that night. Upon finding the room inaccessible, he notified the front desk that his key card did not work. Suspecting Young had stolen the missing items from the room to which he mistakenly was given access, Hicks radioed Officer Koniaris, who was on patrol outside the hotel, and told him that the hotel suspected Young had stolen items from another guest. Officer Koniaris engaged Young in conversation for twenty to thirty minutes, during which time he learned that Young had been arrested for numerous felonies and had spent time in prison. Shortly thereafter, Hicks informed Officer Koniaris of the gun found

---

[1]Hilton Hotel Corporation Standard Practice Instructions section IV, subsection A states, in pertinent part:

> In the event a team member in the course of his/her duties observes or finds a weapon in a guest room, the following procedures apply:
>
> . . .
>
> 3. Security shall E-key the guest room without disturbing the weapon and leave a note on the door for the guest to call Security upon returning to the room.
>
> . . .
>
> 8. If a weapon is found or observed in a guest room after a guest has checked out, the guest room is to be secured as indicated in 3 above. The local police are to be notified and requested to come onto company or hotel property and take possession of the weapon.

in Young's room and asked Officer Koniaris to come upstairs with him to Young's room. With probable cause to believe that Young was a felon in possession of a firearm, Officer Koniaris searched Young for other weapons and handcuffed him to a bench in the hotel security office. It was not until after these events took place that Officer Koniaris followed Carr and Hicks up to the room where he looked "into the room from the hallway." Then, after Hicks showed Officer Koniaris the gun inside the backpack, Officer Koniaris entered the room and took possession of it.

## II

As a disincentive to police overreaching in violation of the Fourth Amendment's bar on "unreasonable searches and seizures," U.S. Const. amend. IV, the exclusionary rule prohibits the introduction of evidence seized during unlawful searches. *Weeks v. United States*, 232 U.S. 383, 398 (1914). Because the underlying goal of the exclusionary rule is to balance "deterring unlawful police conduct with the public interest in having juries receive all probative evidence of a crime," courts have developed a number of exceptions to the rule where the deterrence rationale "has so little basis that the evidence should be received." *Nix v. Williams*, 467 U.S. 431, 443-44 (1984) (discussing the inevitable discovery exception, the independent source exception, and the attenuated basis exception). As the Supreme Court has explained, the purpose of these exceptions is to allow the use of improperly obtained evidence when police misconduct is harmless. *Id*. at 443 n.4 (noting "[t]he ultimate or inevitable discovery exception to the exclusionary rule is closely related in purpose to the harmless-error rule").

In line with this harmless-error approach, the Supreme Court adopted the inevitable-discovery rule in *Nix*, "to block setting aside convictions that would have been obtained without police misconduct." *Id.* In that case, police were transporting a man suspected of involvement in the disappearance of

a 10-year-old girl when one of the officers began questioning him in violation of his right to counsel. *Id.* at 435. The suspect made incriminating statements and directed the officers to the child's body. *Id.* at 436. Meanwhile, a search team was busy combing the woods where the body was located. *Id.* At trial, the prosecution sought to admit evidence concerning the body's location and condition. The accused moved to suppress the evidence, but the state court denied the motion, concluding the search team would have found the body a short while later. *Id.* at 437-38. In subsequent habeas proceedings, the federal district court denied relief for the same reason. *Id.* at 439. The Supreme Court affirmed, holding that, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense." *Id.* at 444 (footnote omitted). Because the body "would ultimately or inevitably have been discovered even if no violation of any constitutional or statutory provision had taken place," *id.* at 434, the government was not precluded from introducing evidence concerning its discovery, *id.* at 450.

In applying *Nix*, we have considered whether evidence may "ultimately or inevitably" be discovered through the exercise of ordinary police practices. In *United States v. Lang*, 149 F.3d 1044, 1046 (9th Cir. 1998), the police discovered a cereal box containing crack cocaine in the engine compartment of a vehicle as a result of an interrogation in violation of the defendant's *Miranda* rights. We applied the inevitable discovery exception " 'to determine whether a reasonable probability of discovery existed prior to the unlawful conduct, based on the information possessed and investigations being pursued at such time.' " *Id.* at 1047 (quoting *United States v. Drosten*, 819 F.2d 1067, 1070 (11th Cir. 1987)). In light of the "training and experience of the officers in searching vehicles for drugs," the district court had found that the police would have discovered the drugs even absent the defendant's

incriminating statements. *Id.* at 1048. Based on that finding, we upheld the district court's denial of the defendant's motion to suppress. *Id.*; *see also United States v. Mancera-Londono*, 912 F.2d 373, 376 (9th Cir. 1990) (holding that drugs discovered in the warrantless search of a rental car were admissible because a standard inventory search after the arrest of a suspect in a rental car would result in police possession of the drugs); *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986) (holding the same in the context of the search of a garment bag).

As the majority rightly points out, the inevitable discovery doctrine does not apply where police officers simply fail to obtain a search warrant after their investigation has uncovered sufficient evidence to give them probable cause to conduct a search. In such circumstances, the exclusionary rule prevents the government from using evidence it would not have obtained absent an unlawful search, thereby deterring police from ignoring the warrant requirement. In *United States v. Reilly*, 224 F.3d 986, 990 (9th Cir. 2000), for example, the police conducted a search based on invalid consent and thereafter discovered physical evidence. We held that such evidence was not admissible under the inevitable discovery doctrine, which "applies only when the fact that makes discovery inevitable is born of circumstances other than those brought to light by the illegal search itself." *Id.* at 995; *see also United States v. Mejia*, 69 F.3d 309, 320 (9th Cir. 1995) (inevitable discovery doctrine not applicable to items discovered during search of suspect's residence pursuant to allegedly invalid consent, whether or not suspect's consent was valid); *United States v. Echegoyen*, 799 F.2d 1271, 1280 n.7 (9th Cir. 1986) (inevitable discovery doctrine did not justify entry into a residence by narcotics detectives based on their observations of signs of likely drug manufacturing activities, even if a search warrant would have inevitably been issued).

Yet, if "the fact that makes discovery inevitable is born of circumstances other than those brought to light by the illegal

search," *Reilly*, 224 F.3d at 995, application of the inevitable discovery rule is necessary to avoid putting the government in a worse position than it would be absent a police officer's error. We do not limit the circumstances that make discovery inevitable in a rigid or mechanical way, nor do we limit the inevitable discovery doctrine to those circumstances where an independent search would have discovered the evidence, as in *Nix.* For example, as noted above, we have held evidence admissible under the inevitable discovery doctrine when ordinary police practices would have uncovered the evidence. *See, e.g.*, *Lang*, 149 F.3d at 1048. Indeed, as explained by Judge (now Justice) Kennedy:

> There will be instances where, based on the historical facts, inevitability is demonstrated in such a compelling way that operation of the exclusionary rule is a mechanical and entirely unrealistic bar, preventing the trier of fact from learning what would have come to light in any case. In such cases, the inevitable discovery doctrine will permit introduction of the evidence, whether or not two independent investigations were in progress. The existence of two independent investigations at the time of discovery is not, therefore, a necessary predicate to the inevitable discovery exception.

*United States v. Boatwright*, 822 F.2d 862, 864 (9th Cir. 1987). In other words, even when evidence has been seized in violation of the Fourth Amendment, the government can introduce the evidence at trial if it would have been discovered by the government anyway. Such unlawfully procured evidence is not subject to the exclusionary rule, because suppressing the evidence would put the government in a worse position "than it would have been in if no illegality had transpired." *Nix*, 467 U.S. at 443.

III

Applying this principle to the evidence at issue in this case, we must ask whether the record shows that the police ultimately would have obtained possession of the gun based on the situation as it existed before Officer Koniaris unlawfully took the gun out of the hotel room. *See Lang*, 149 F.3d at 1047. The answer to this question is yes. By the time Officer Koniaris entered the hotel room, security staff had already discovered Young's gun by virtue of purely private action on the part of the hotel.[2] The hotel had already notified Officer Koniaris of the existence of the gun and its exact location. Officer Koniaris had already determined that Young was a felon and that the gun was therefore evidence of a crime. Moreover, it is clear that Officer Koniaris and the hotel staff went to Young's room because the hotel security staff wanted to give the gun to Officer Koniaris and he wanted it as evidence. Because the hotel staff had discovered the gun before Officer Koniaris commenced his investigation, it was a reasonable certainty that the police ultimately would have obtained possession of the gun by lawful means. *See Nix*, 467 U.S. at 444. Accordingly, any error by Officer Koniaris in entering the hotel room was harmless.

Nevertheless, the district court rejected the government's inevitable discovery argument:

> The Court does not find this [inevitable discovery] argument persuasive as it is counter to the hotel policy and based on speculation that the hotel would never [have let] the defendant back in the room. I'm not sure that's necessarily correct, especially that the defendant could have come back and said, you know, "I know the person in the other room," and I — it's just as much speculation or as little to say, he

---

[2]Young does not challenge the legality of the first search, which was conducted by hotel employees.

could have exonerated himself and then he would not have been ejected from the room — or evicted from the room.

Parsing this holding, it appears that the district court based its grant of Young's motion to suppress the gun on two factual findings, namely: (1) the government's claim that it would have inevitably obtained the gun "is counter to the hotel policy" and (2) the government's claim is "based on speculation" that Young would not have been able to obtain access to the room to retrieve the gun.

In making its first finding, the district court failed to consider the facts before it. Because the hotel's policy provides a procedure for returning guns to hotel guests, it is reasonable to infer that, under ordinary circumstances, the hotel would not turn over a guest's gun to the police. But the hotel's written policy does not address the situation where, as here, the guest in possession of a weapon is a known felon and the lead suspect in an ongoing criminal investigation taking place at the hotel. Therefore, nothing in the policy is contrary to security director Marweg's statement that, under such circumstances, "the police must come to the hotel and take possession of the weapon." The district court's finding that turning over a weapon to the police in these circumstances would have been counter to the hotel policy is clearly erroneous. The majority similarly misreads the hotel's policy.

The district court's second finding, that it was speculative to conclude that the hotel would never have let Young back into his room, is clarified by the majority, which hypothesizes that "it is entirely likely that after some discussion with hotel security, Young might have decided to store the weapon, or, alternatively, take his belongings with him and vacate the room." This finding is also clearly erroneous. In determining whether the police inevitably would have obtained the gun, the district court was required to consider the "demonstrated historical facts" of the case, *Nix*, 467 U.S. at 444 n.5, at the

time directly before the unlawful conduct, *Lang*, 149 F.3d at 1047. Yet here, at the crucial moment before the unlawful entry, Young was a criminal suspect handcuffed to a chair in the hotel's security office. Whether or not Officer Koniaris conducted the unlawful search of the hotel room, Young's next destination was the police station for booking, not back to his hotel room to pack up. Under the facts of this case, no reasonable sequence of events would lead to Young retrieving his gun before the police inevitably obtained it.

IV

This is a case where, "based on the historical facts, inevitability is demonstrated in such a compelling way that operation of the exclusionary rule is a mechanical and entirely unrealistic bar." *Boatwright*, 822 F.2d at 864. Lawful police acquisition of Young's gun was inevitable due to the hotel staff's independent discovery of the gun and communication of that information to the police. The majority's contention that the inevitable discovery doctrine is inapplicable on the ground that Officer Koniaris's seizure of the gun was contrary to the warrant requirement of the Fourth Amendment misses the point. The question is not whether Officer Koniaris's seizure of the gun was lawful, but whether the district court's holding is contrary to the Supreme Court's instruction that the exclusionary rule should not "put the police in a worse position than they would have been in if no unlawful conduct had transpired." *Nix*, 467 U.S. at 445 (emphasis omitted). Because proper application of the inevitable discovery rule would put the police in the same position it would have been in absent Officer Koniaris's error, I would hold that the district court erred by suppressing the gun as evidence. Accordingly, I would reverse the grant of Young's motion to suppress, and I respectfully dissent.