SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**State v. Ricky Wright** (A-64-13) (073137)

**Argued January 5, 2015 -- Decided May 19, 2015**

**RABNER, C.J., writing for a unanimous Court.**

The issue in this appeal is whether the "third-party intervention" or "private search" doctrine applies to a warrantless search of a home. The doctrine originally addressed situations like the following: Private actors search an item, discover contraband, and notify law enforcement officers or present the item to them. The police, in turn, replicate the search without first getting a warrant. Because the original search is carried out by private actors, it does not implicate the Fourth Amendment. And if the officers' search of the item does not exceed the scope of the private search, the police have not invaded a defendant's protected privacy interest and do not need a warrant. The State now seeks to expand the doctrine to a very different setting: the search of a private home.

In this case, co-defendant Evangeline James and her young children lived in an apartment on the first floor of a two-family home in Asbury Park. Defendant Ricky Wright, James' boyfriend, stayed at the apartment about three to four nights per week. On Sunday evening, March 29, 2009, James called her landlord, Alfred Santillo, and reported a "major water leak" in the kitchen ceiling. Santillo told James to shut off the main water valve and said that he would stop by with a plumber the next morning. Santillo and the plumber, Nicholas Alexo, arrived at the apartment before noon on Monday. Because no one was home, Santillo called James, who did not answer her phone. After waiting about a half hour, Santillo let himself into the apartment, as he had done on prior occasions.

Santillo and Alexo saw water and sewage leaking from the kitchen ceiling. Because the water pipes in the kitchen led to the back of the apartment, Alexo went to the rear bedroom to check for other leaks. Alexo saw a small bag of marijuana on top of a nightstand. Inside an open drawer of the nightstand, he also saw a small box that he believed contained powder or crack cocaine. Alexo called Santillo into the bedroom and showed him the items. They then called the police. Officer Carl Christie responded. He walked into the apartment and looked around the kitchen and bedroom area. He, too, noticed the drugs and found a scale as well. Neither Santillo nor Alexo had told him about the scale. Christie called for back-up. A number of officers responded, including Officer Lorenzo Pettway of the narcotics unit. The police conducted a full search moments later, with the resident's consent, and found other contraband, including drug paraphernalia and a handgun loaded with hollow-point bullets. After the search, the police arrested James. Defendant Wright arrived as they were leaving the apartment, and the police arrested him as well.

A Monmouth County grand jury indicted Wright and James on various drug offenses, second-degree possession of a firearm in the course of committing a drug offense, second-degree possession of a firearm for an unlawful purpose, and fourth-degree possession of a prohibited weapon, namely, body armor piercing bullets. Wright moved to suppress the evidence. During the hearing, Pettway conceded that "it wasn't particularly urgent . . . to search right away." He acknowledged that the police had time to secure the house and apply for a search warrant. The trial court denied Wright's motion to suppress, concluding that the search of the apartment did not violate the Fourth Amendment. The judge relied on the third-party intervention doctrine and explained that Christie's inspection did not exceed the scope of the search initially done by private citizens. As a result, the court concluded that Christie's conduct did not violate the Federal or State Constitutions. The court also found that James voluntarily and knowingly consented to the full search conducted by Pettway and others.

Wright appealed and the Appellate Division affirmed. State v. Wright, 431 N.J. Super. 558 (App. Div. 2013). The panel agreed that the evidence seized could be admitted under the third-party intervention doctrine because (1) Santillo's initial entry "was lawful and did not trample upon [James's] property rights or reasonable privacy expectations," and (2) Officer Christie's entry was limited to verifying Santillo's observations.

1

The Court granted Wright's petition for certification limited to the following issue: "whether the third party intervention doctrine is applicable to permit police to search residential property without a warrant." 217 N.J. 283 (2014).

**HELD:** The third-party intervention or private search doctrine does not exempt law enforcement's initial search of defendant's home from the warrant requirement. Absent exigency or some other exception to the warrant requirement, the police must get a warrant to enter a private home and conduct a search, even if a private actor has already searched the area and notified law enforcement.

1. The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution guard against warrantless searches. The first clause of each guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The United States Supreme Court recently reaffirmed the heightened status of the home under the Constitution. The Court observed that "when it comes to the Fourth Amendment, the home is first among equals" and stands "at the Amendment's very core." Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013). A warrantless search of a private dwelling is "presumptively invalid," State v. Lamb, 218 N.J. 300, 315 (2014), and calls for "particularly careful scrutiny," State v. Bolte, 115 N.J. 579, 583 (1989). To overcome that presumption, the State must show that a warrantless search falls within a recognized exception to the warrant requirement. (pp. 12-15)

2. The third-party intervention doctrine has its roots in Burdeau v. McDowell, in which the Supreme Court held that the Fourth Amendment's warrant requirement applies only to government agents, not private actors. 256 U.S. 465 (1921). The Supreme Court reaffirmed that principle in Walter v. United States, 447 U.S. 649 (1980). Neither the United States Supreme Court nor this Court has applied the third-party intervention or private search doctrine to the search of a private home. That would represent a significant expansion of the doctrine. Police would no longer simply be asked to view a discrete set of items turned over to them. Instead, they would walk through a private residence and observe far more. Courts around the country have wrestled with this question. Some have expressly declined to expand the doctrine to private dwellings. Other courts have permitted warrantless searches of a private home that did not exceed the scope of an earlier private search. (pp. 15-26)

3. The United States Supreme Court has never applied the private search doctrine to the home, and this Court does not glean from recent decisions that it would allow such an extension. Relying on the protections in the State Constitution, the Court concludes that the private search doctrine cannot apply to private dwellings. Absent exigency or some other exception to the warrant requirement, the police must get a warrant to enter a private home and conduct a search, even if a private actor has already searched the area and notified law enforcement. A landlord, like any other guest, may tell the police about contraband he or she has observed. And the police, in turn, can use that information to apply for a search warrant. But that course of events does not create an exception to the warrant requirement. To hold otherwise would result in a sizeable exception to the requirement and expand the private search doctrine beyond the minimal intrusion it originally sanctioned. An invitation to a plumber, a dinner guest, or a landlord does not open the door to one's home to a warrantless search by a police officer. In addition, in this case, the State cannot rely on the plain view doctrine to justify the seizure of the scale because the officer was not "lawfully in the viewing area." (pp. 26-30)

4. The third-party intervention or private search doctrine does not exempt law enforcement's initial search of defendant's home from the warrant requirement. Nothing in this opinion, however, is intended to cast doubt on the private search or third-party intervention doctrine in its original form. When the police reexamine property that has been searched by a private actor and presented to law enforcement in a non-residential context, neither the Fourth Amendment nor the State Constitution requires a warrant. (pp. 30-32)

The judgment of the Appellate Division is **REVERSED** and the matter is **REMANDED** to the trial court for further proceedings consistent with the Court's opinion.

**JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in CHIEF JUSTICE RABNER's opinion. JUDGE CUFF (temporarily assigned) did not participate.**

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

RICKY WRIGHT,

    Defendant-Appellant.


        Argued January 5, 2015 – Decided May 19, 2015

        On certification to the Superior Court, Appellate Division, whose opinion is reported at 431 N.J. Super. 558 (App. Div. 2013).

        Rochelle M.A. Watson, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Sylvia M. Orenstein, Assistant Deputy Public Defender, of counsel and on the briefs).

        Steven A. Yomtov, Deputy Attorney General, argued the cause for respondent (John J. Hoffman, Acting Attorney General of New Jersey, attorney).

        Joseph A. Pace argued the cause for amicus curiae American Civil Liberties Union of New Jersey (Gibbons, attorneys; Mr. Pace and Lawrence S. Lustberg, on the brief).


    CHIEF JUSTICE RABNER delivered the opinion of the Court.

    In this case, we consider whether the "third-party

intervention" or "private search" doctrine applies to a warrantless search of a home.

The doctrine originally addressed situations like the following: Private actors search an item, discover contraband, and notify law enforcement officers or present the item to them. The police, in turn, replicate the search without first getting a warrant. See, e.g., United States v. Jacobsen, 466 U.S. 109, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984). Because the original search is carried out by private actors, it does not implicate the Fourth Amendment. And if the officers' search of the item does not exceed the scope of the private search, the police have not invaded a defendant's protected privacy interest and do not need a warrant.

The State now seeks to expand the doctrine to a very different setting: the search of a private home. In this case, a resident reported a leak in her apartment to her landlord, who showed up the following day with a plumber. The landlord and plumber entered the apartment while no one was home, spotted the leak in the kitchen, and checked elsewhere for additional leaks. In the rear bedroom, the plumber saw drugs on top of a nightstand and inside an open drawer. He and the landlord notified the police.

Instead of using that information to apply for a search warrant, an officer walked into the apartment and looked around

2

the kitchen and bedroom area.  He, too, noticed the drugs and found a scale as well.  The police conducted a full search moments later, with the resident's consent, and found other contraband.

The Federal and State Constitutions both recognize the sanctity and privacy of a person's home.  The United States Supreme Court and this Court have repeatedly emphasized that a person's home is entitled to the highest form of protection against warrantless searches.  The police, therefore, must get a warrant before they may search a home, unless an exception to the warrant requirement applies.

We do not find that the third-party intervention doctrine qualifies as an exception here.  The United States Supreme Court has not applied the private search doctrine to private dwellings, and we decline to extend the doctrine in that way under the State Constitution.  Homes are filled with intimate, private details about peoples' lives that are ordinarily free from government scrutiny.  An officer's entry into a home is a far greater intrusion than a search of a package presented to the police.  Also, inviting a plumber or dinner guest into a private home does not carry with it an invitation to the police.

Residents of course run the risk that any private actor they invite into their home may tell the police what they have seen.  And the police, in turn, can use that information to

3

apply for a search warrant.  In this case, because the police did not obtain a warrant before first entering defendant's apartment, the officer's original search did not comply with the State Constitution.  The State does not rely on exigent circumstances here.  When those circumstances are present, a warrant is not required.  State v. Earls, 214 N.J. 564, 569 (2013).

We therefore reverse the judgment of the Appellate Division, which affirmed the trial court and upheld the search. We also remand the matter to the trial court to determine whether the initial unlawful search tainted the later consent search.

I.

The following facts are taken from testimony presented at a pretrial suppression hearing.  Three police officers and co-defendant Evangeline James testified; the trial court credited the officers' testimony and found that James was not credible.

James and her three young children lived in an apartment on the first floor of a two-family home in Asbury Park.  Defendant Ricky Wright, James's boyfriend and the father of her youngest child, stayed at the apartment about three to four nights per week.

On Sunday evening, March 29, 2009, James called her landlord, Alfred Santillo, and reported a "major water leak" in

4

the kitchen ceiling.  Santillo told James to shut off the main water valve and said that he would stop by with a plumber the next morning to fix the leak.

Santillo and the plumber, Nicholas Alexo, arrived at the apartment before noon on Monday.  Because no one was home, Santillo called James, who did not answer her phone.  After waiting about a half hour, Santillo let himself into the apartment, as he had done on prior occasions.

Santillo and Alexo saw water and sewage leaking from the kitchen ceiling.  Because the water pipes in the kitchen led to the back of the apartment, Alexo went to the rear bedroom to check for other leaks.  Alexo saw a small bag of marijuana on top of a nightstand.  Inside an open drawer of the nightstand, he also saw a small box that he believed contained powder or crack cocaine.  Alexo called Santillo into the bedroom and showed him the items.  They then called the police.

Officer Carl Christie responded shortly before 1 p.m.  He spoke with Santillo and Alexo, who explained what happened and what they had seen.  Christie entered the apartment without a search warrant.  Along with Santillo and Alexo, he saw the leak in the kitchen and then went to the rear bedroom.  Christie noticed a small nightstand with marijuana on it and, in an open drawer of the nightstand, he saw an open cardboard box with bags of cocaine inside.  Christie also spotted a small scale in the

5

same drawer. Neither Santillo nor Alexo had told him about the scale.

Christie then called for back-up while Alexo and Santillo tried to repair the leak. A number of officers responded, including Officer Lorenzo Pettway of the narcotics unit. At this point, six officers were on the scene.

Christie briefed Pettway and told him about the drugs in the bedroom. Santillo and Alexo also told Pettway what had taken place. Pettway got James's phone number from Santillo and called her. He relayed that James's landlord had found "some items" in her apartment and asked her to return so that he could retrieve them. James arrived about fifteen to twenty minutes later.

Pettway and James then spoke outside the apartment. Pettway explained that drugs had been found inside and asked for consent to remove them and search the apartment for additional narcotics. Pettway testified that James agreed and signed a consent to search form.

During the search that followed, the officers found the following items in addition to the drugs and scale that Christie had observed: a handgun loaded with hollow-point bullets -- inside a partially opened red and black book bag; a little less than one hundred bullets of different caliber sizes -- inside a black camera bag; a box of baking soda and sandwich bags,

6

commonly used to cut and package cocaine; and a Pyrex plate and measuring cup, both of which had some powder residue that appeared to be cocaine.

After the search, the police arrested James. Defendant Wright arrived as they were leaving the apartment, and the police arrested him as well. Wright had returned to the apartment in response to an earlier call from James and the police.

A Monmouth County grand jury indicted Wright and James in November 2009. The eight-count indictment charged them with third-degree possession of cocaine, a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1); second-degree possession of cocaine with intent to distribute, N.J.S.A. 2C:35-5(b)(2); third-degree possession of cocaine with intent to distribute within 1000 feet of school property, N.J.S.A. 2C:35-7; second-degree possession of a firearm in the course of committing a drug offense, N.J.S.A. 2C:39-4.1(a); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a); and, fourth-degree possession of a prohibited weapon, namely, body armor piercing bullets, N.J.S.A. 2C:39-3(f) (mistakenly cited as N.J.S.A. 2C:39-3(e)). Wright alone was also charged with third-degree making of terroristic threats, N.J.S.A. 2C:12-3, and second-degree witness tampering, N.J.S.A. 2C:28-5(a).

7

Wright moved to suppress the evidence. During a three-day hearing, the trial court heard testimony from Christie, Pettway, and another officer; their testimony is partly summarized above. James also testified and offered a different account. She claimed that when she first called Santillo on Sunday, March 29, he said he would arrive at 4:00 p.m. the next day; that no dresser drawers were open when she left the apartment on Monday morning; that when Santillo called her at about 11:00 a.m. on Monday, she said she would return in forty-five minutes and did not give him permission to enter the apartment; that when she arrived, the police told her they had found drugs and a weapon in the apartment; and, among other things, that she consented to a search while handcuffed, after the police said they would not "call DYFS" if she cooperated.

During the hearing, Pettway also conceded that "it wasn't particularly urgent . . . to search right away." He acknowledged that the police had time to secure the house and apply for a search warrant.

The trial court denied Wright's motion to suppress. In a written opinion, the court accepted and relied heavily on the officers' testimony. The judge found that James was "unreliable, untrustworthy, incredible and in all likelihood false in her attempt to exculpate her co-defendant who fathered

their child and who controls her in a domineering, abusive relationship."

The trial court concluded that the search of the apartment did not violate the Fourth Amendment. The judge relied on the third-party intervention doctrine, an exception to the warrant requirement. The court explained that Christie's inspection did not exceed the scope of the search initially done by private citizens. As a result, the court concluded that his conduct did not violate the Federal or State Constitutions. The court also found that James voluntarily and knowingly consented to the full search conducted by Pettway and others.

Wright pled guilty to the entire indictment but did not waive his right to appeal the suppression ruling. See R. 3:5-7(d). The trial court sentenced him to an aggregate term of fifteen years' imprisonment, with a six-year period of parole ineligibility. Afterward, the State dismissed all charges against James.

Wright appealed. In a thorough and thoughtful opinion, the Appellate Division affirmed. See State v. Wright, 431 N.J. Super. 558, 564 (App. Div. 2013). The decision reviewed relevant federal and state case law on the third-party intervention doctrine and its application to searches of private dwellings. Id. at 575-87. The opinion underscored how important it is that "the police's entry . . . be no greater

9

than the scope of the landlord's [prior] private observations." Id. at 582. In light of the heightened protection the law provides to private residences, the Appellate Division also restricted the doctrine's application in that setting. Id. at 587-88. The panel held that, under the Federal and State Constitutions,

> the third-party intervention doctrine will not justify a warrantless search resulting from a landlord or other third party's entry into a private residence if it is (1) illegal or unauthorized, or (2) in violation of the resident's property rights or reasonable expectation of privacy. If such a wrongful private entry has occurred, it cannot supply the foundation for an ensuing police search of the premises, unless, of course, some other recognized exception to the constitutional warrant requirement applies. As an additional limitation, even if the private entry is not illegal or unauthorized, the third-party intervention doctrine should not apply if the intrusion by the private actor and law enforcement officials, taken as a whole, is objectively unreasonable.

> [Ibid.]

Applying those principles, the panel agreed that the evidence seized could be admitted because (1) Santillo's initial entry "was lawful and did not trample upon [James's] property rights or reasonable privacy expectations," and (2) Officer Christie's entry was limited to verifying Santillo's observations. Id. at 588. The panel also concluded that there

10

was a sound basis for the trial judge to find that James validly consented to Pettway's search.  Id. at 595.

We granted Wright's petition for certification limited to the following issue:  "whether the third party intervention doctrine is applicable to permit police to search residential property without a warrant."  217 N.J. 283 (2014).  We also granted the motion of the American Civil Liberties Union of New Jersey (ACLU) to appear as amicus curiae.

II.

Wright argues that the third-party intervention doctrine should not apply to searches of private homes.  Because of the unique status of the home under the Fourth Amendment and the State Constitution, Wright contends that police must get a warrant before they can search a private residence, absent exigent circumstances.  As a result, he maintains that the judgment of the Appellate Division should be reversed.

The State, represented by the Attorney General, counters that the police lawfully entered James's residence under the third-party intervention doctrine to confirm what private actors had already seen.  The State contends that because the police confined their actions to the scope of the initial private search, this appeal presents a classic example of why the doctrine should be upheld in the context of a private residence.

11

The State thus agrees with the judgment of the Appellate Division but urges that its test be reconsidered. The State believes that the Appellate Division's test places too much emphasis on the private actor's behavior and should instead focus on whether the police conduct was reasonable.

The ACLU maintains that the State Constitution "does not countenance a private search exception to the warrant requirement." Amicus argues that, under New Jersey case law, "limited disclosure" to a third party "does not extinguish an individual's reasonable expectation of privacy vis-à-vis the police." In addition, the ACLU submits that applying the doctrine to a search of a private residence violates both the Fourth Amendment and the State Constitution and does not reflect how people "protect their privacy in the real world: granting a plumber entry to fix the pipes does not result in an 'open house.'"

The State rejects the ACLU's reliance on case law that addresses an individual's expectation of privacy in information given to a third party. The private search doctrine, the State submits, "is more akin to third-party consent law."

### III.

We begin with familiar principles. Both the Fourth Amendment and Article I, Paragraph 7 of the New Jersey Constitution guard against warrantless searches. The first

12

clause of each guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7.  Before police officers may conduct a search, therefore, they must obtain a warrant or show that a recognized exception to the warrant requirement applies.  Earls, supra, 214 N.J. at 588.

A.

This case involves the search of a home, which raises special concerns.  As the Court has repeatedly observed, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  State v. Lamb, 218 N.J. 300, 314 (2014) (quoting State v. Vargas, 213 N.J. 301, 313 (2013) (quoting United States v. U.S. Dist. Court, 407 U.S. 297, 313, 92 S. Ct. 2125, 2135, 32 L. Ed. 2d 752, 764 (1972))); State v. Walker, 213 N.J. 281, 289 (2013); State v. Harris, 211 N.J. 566, 595 (2012); State v. Davila, 203 N.J. 97, 112 (2010).

The unique status of the home has been recognized for centuries.  Miller v. United States, 357 U.S. 301, 307, 78 S. Ct. 1190, 1195, 2 L. Ed. 2d 1332, 1337 (1958) (noting debate in Parliament in 1763 about search of cottage by King's forces).  And throughout our nation's history, one of our "most protected rights . . . has been the sanctity and privacy of a person's home."  State v. Bruzzese, 94 N.J. 210, 217 (1983) (citation

13

omitted), cert. denied, 465 U.S. 103, 104 S. Ct. 1295, 79 L. Ed. 2d 695 (1984). Those interests "are entitled to the highest degree of respect and protection in the framework of our constitutional system." State v. Evers, 175 N.J. 355, 384 (2003); see also United States v. Martinez-Fuerte, 428 U.S. 543, 561, 96 S. Ct. 3074, 3084, 49 L. Ed. 2d 1116, 1130 (1976) ("[T]he sanctity of private dwellings [is] ordinarily afforded the most stringent Fourth Amendment protection."); State v. Johnson, 168 N.J. 608, 625 (2001) ("'An individual's privacy interests are nowhere more clearly defined or rigorously protected by the courts than in the home.'" (quoting Kornegay v. Cottingam, 120 F.3d 392, 399-400 (3d Cir. 1997))).

The United States Supreme Court recently reaffirmed the heightened status of the home under the Constitution. The Court observed that "when it comes to the Fourth Amendment, the home is first among equals" and stands "at the Amendment's very core." Florida v. Jardines, ___ U.S. ___, ___, 133 S. Ct. 1409, 1414, 185 L. Ed. 2d 495, 501 (2013) (internal quotation marks omitted).

This Court also recently emphasized the preeminent position of a private residence when it held that the community-caretaking doctrine, standing alone, could not justify a warrantless search of a home. Vargas, supra, 213 N.J. at 325.

14

The law, thus, "expresses a clear preference for police officers to secure a warrant before entering and searching a home." State v. Brown, 216 N.J. 508, 527 (2014). A warrantless search of a private dwelling is "presumptively invalid," Lamb, supra, 218 N.J. at 315 (citations omitted), and calls for "particularly careful scrutiny," State v. Bolte, 115 N.J. 579, 583, cert. denied, 493 U.S. 936, 110 S. Ct. 330, 107 L. Ed. 2d 320 (1989). To overcome that presumption, the State must show that a warrantless search falls within a recognized exception to the warrant requirement. Lamb, supra, 218 N.J. at 315; see also Riley v. California, ___ U.S. ___, ___, 134 S. Ct. 2473, 2482, 189 L. Ed. 2d 430, 439 (2014).

B.

The State relies on the third-party intervention doctrine, also known as the private search doctrine, to justify the warrantless search in this case. The doctrine has its roots in Burdeau v. McDowell, in which the Supreme Court held that the Fourth Amendment's warrant requirement applies only to government agents, not private actors. 256 U.S. 465, 41 S. Ct. 574, 65 L. Ed. 1048 (1921). In Burdeau, a private detective seized incriminating items from the defendant's office, and the items were ultimately turned over to the Department of Justice. Id. at 473-74, 41 S. Ct. at 575, 65 L. Ed. at 1050. Because no government official had "anything to do with the wrongful

15

seizure," the Court found no Fourth Amendment violation.  Id. at 475, 41 S. Ct. at 576, 65 L. Ed. at 1051.

The Supreme Court reaffirmed that principle in Walter v. United States, 447 U.S. 649, 100 S. Ct. 2395, 65 L. Ed. 2d 410 (1980).  In that case, sealed packages of films were mistakenly delivered to a third party, who unwrapped and examined them and then called the Federal Bureau of Investigation.  Id. at 651-52, 100 S. Ct. at 2399, 65 L. Ed. 2d at 414-15.  An agent picked up the packages, which contained hundreds of boxes of films and "explicit descriptions of the contents."  Ibid.

The government ultimately pursued obscenity-related charges, and the defendants moved to suppress.  Id. at 652, 100 S. Ct. at 2399, 65 L. Ed. 2d at 415.  The Court held that the government could search the films "to the extent that they had already been examined by third parties"; but the agents needed a warrant to screen the films, which went beyond the scope of the private search.  Id. at 656, 658-59, 100 S. Ct. at 2401-03, 65 L. Ed. 2d at 417-19.

In Jacobsen, supra, the Court applied those principles in a related context.  Employees of a private carrier examined a package that had been damaged in transit by a forklift.  466 U.S. at 111, 104 S. Ct. at 1655, 80 L. Ed. 2d at 92.  Pursuant to company policy, they opened the package to inspect its contents in case of an insurance claim.  Ibid.  The package, an

16

ordinary cardboard box with crumpled newspaper packed on top, contained a silver tube that the employees cut open; inside it, they found four plastic bags, one within the next. Id. at 111, 104 S. Ct. at 1655, 80 L. Ed. 2d at 93. In the innermost bag, the employees found white powder. Ibid. They notified the Drug Enforcement Administration, placed the bags back in the tube, and put the tube and newspapers back into the box. Ibid.

An agent arrived and removed the plastic bags from the tube. Ibid. He opened each one, field tested the contents, and confirmed that the powder was cocaine. Id. at 111-12, 104 S. Ct. at 1655, 80 L. Ed. 2d at 93. The defendants later challenged the search.

The Court noted that the initial search by company employees did not violate the Fourth Amendment because of its "private character." Id. at 115, 104 S. Ct. at 1657, 80 L. Ed. 2d at 95. The Court next examined the government agent's actions to decide whether "they exceeded the scope of the private search." Ibid. The Court concluded that the agent's removal of the bags and visual inspection of their contents did not infringe any legitimate privacy rights because the acts "enabled the agent to learn nothing that had not previously been learned during the private search." Id. at 120, 104 S. Ct. at 1660, 80 L. Ed. 2d at 98. The Court also found that the field test "merely disclose[d]" whether the powder was cocaine and

17

thus did not "compromise any legitimate interest in privacy." Id. at 123, 104 S. Ct. at 1661, 80 L. Ed. 2d at 100. "In sum," the Jacobsen Court held, "the federal agents did not infringe any constitutionally protected privacy interest that had not already been frustrated as the result of private conduct." Id. at 126, 104 S. Ct. at 1663, 80 L. Ed. 2d at 102.

## C.

The Appellate Division and this Court considered the third-party intervention doctrine in State v. Saez, 268 N.J. Super. 250 (App. Div. 1993), rev'd on dissent, 139 N.J. 279 (1995).

In Saez, an informant told police that she saw "narcotic activity" in the basement of a neighboring apartment. Saez, supra, 268 N.J. Super. at 256. She was able to see through gaps in a wood partition that separated the two basements. Id. at 256-57. The informant allowed an officer to set up surveillance from her basement, and he surveilled the apartment for an extended period. Id. at 257. The officer looked through the holes in the wooden wall and held a mirror over his head to see through a gap in the wall above a furnace. Id. at 257-58. Almost at once, he saw three males make crack cocaine; over time, he observed additional activity that led to the defendants' arrests. Id. at 258-59.

Both the majority and dissent relied on Jacobsen. The majority did not find the officer's conduct amounted to an

18

unreasonable search because "[h]is observations went no further than . . . the informant's." Id. at 264. Judge D'Annunzio, in dissent, disagreed. He explained that when "the government expands the private search, the third-party intervention exception no longer applies to the fruits of the expanded search." Id. at 271 (D'Annunzio, J.A.D., dissenting). The dissent also stressed that "the police were not invited to view specific, immutable objects" in the possession of the informant. Id. at 272 (D'Annunzio, J.A.D., dissenting). Instead, "[b]ecause no one could predict with certainty what the police would see, unlike the Jacobsen line of cases, each moment of surveillance was a new invasion of privacy." Id. at 273 (D'Annunzio, J.A.D., dissenting).

In a brief per curiam decision, the Court reversed substantially for the reasons in Judge D'Annunzio's dissent. Saez, supra, 139 N.J. at 280. As the Court explained, "we are generally in accord with the dissenting opinion's analysis that described the extended and continuous police surveillance as a significant expansion of the informant's prior observation of the activities conducted in the adjacent basement." Id. at 281. The Court did not address whether the third-party intervention doctrine was limited to cases in which an informant gave law enforcement an item to inspect. Id. at 280.

19

Consistent with Jacobsen, the Appellate Division in State v. Premone, 348 N.J. Super. 505, 513-14 (App. Div. 2002), found that the third-party intervention doctrine did not apply because the police exceeded the scope of a private search. In that case, the owner of a motel gave the police a patron's zippered bag; the police opened it and examined its contents without first getting a warrant. Id. at 509.

D.

Neither the United States Supreme Court nor this Court has applied the third-party intervention or private search doctrine to the search of a private home. To be sure, that would represent a significant expansion of the doctrine. Police would no longer simply be asked to view a discrete set of items turned over to them. Instead, they would walk through a private residence and observe far more.

Courts around the country have wrestled with this question. Some have expressly declined to expand the doctrine to private dwellings. The Sixth Circuit, for example, has refused to extend the private search doctrine "to cases involving private searches of residences." United States v. Allen, 106 F.3d 695, 699 (6th Cir.), cert. denied, 520 U.S. 1281, 117 S. Ct. 2467, 138 L. Ed. 2d 223 (1997).

In Allen, a motel manager entered a customer's room, saw marijuana inside, and called the police who initially entered

20

the room without a warrant.  Id. at 697.  The government relied on Jacobsen, in part, to justify the warrantless search.  In response, the court noted that the defendant "had a legitimate and significant privacy interest in the contents of his motel room, and this privacy interest was not breached in its entirety merely because the motel manager viewed some of those contents." Id. at 699.  The court distinguished Jacobsen, "which measured the scope of a private search of a mail package, the entire contents of which were obvious."  Ibid.  In plain language, the court explained that it was "unwilling to extend the holding in Jacobsen" to a search of a private dwelling.  Ibid.

The Sixth Circuit reaffirmed that holding in United States v. Williams, 354 F.3d 497, 510 (6th Cir. 2003).  Williams involved facts similar to the case on appeal:  a landlord concerned about a water leak entered a rental unit and "became suspicious of criminal activity."  Id. at 499.  Her niece called the authorities, who walked through the property with the women and found marijuana.  Id. at 499-501.  Once again, the Sixth Circuit noted the "real distinction between a federal express package and a home, which is entitled to significantly more protection," and declined to extend Jacobsen to the warrantless search of a private home.  Id. at 510.

The Ninth Circuit expressly agreed with the reasoning in Allen in United States v. Young, 573 F.3d 711, 721 (9th Cir.

21

2009).  In Young, hotel staff searched a guest's room, found a firearm, and called the police.  Id. at 713.  Without first getting a warrant, an officer entered the room with a staff member who showed him the gun.  Ibid.  The government again relied on Jacobsen.  Id. at 720.  The Ninth Circuit, in turn, observed that the language in Jacobsen "suggests a very restricted application of the holding" in the case.  Ibid.  The court added that "there are no facts presented here that persuade us to expand Jacobsen's decision to warrantless searches of private residences."  Ibid.

A number of state courts have likewise refused to extend the private search doctrine to a home.  The Supreme Court of Colorado, in People v. Brewer, 690 P.2d 860 (Colo. 1984), concluded that police could not enter a rented home without a warrant, at a landlord's invitation, to see marijuana that the landlord had already found.  The court noted that Jacobsen could not support such a warrantless search:  "[t]he decision . . . was based in part on the minimal intrusion involved in the governmental search of an unwrapped package, and has never been used to justify an invasion of privacy as substantial as entry into a house."  Id. at 863 n.3.

The Idaho Supreme Court reached the same conclusion in State v. Johnson, 716 P.2d 1288 (Idaho 1986).  The Court held that Jacobsen did not support an officer's warrantless entry

22

into a rented apartment, at the landlord's invitation, to observe "suspicious plants." Id. at 1290, 1292 & n.2. As the court explained,

> [i]f the state were to have its way on this point, it would apparently argue that the following scenario is outside constitutional protection: A private citizen ransacks a home, claiming to be in search of contraband. Upon discovering the alleged contraband, the citizen calls in the police who conduct a second ransacking of the home, looking and searching everywhere and inspecting everything as did the citizen. According to the state, because the officer is only "viewing" the citizen's efforts -- "merely" retracing the citizen's footsteps -- such government activity is outside the purview of federal and state constitutional protections. Such an aberrational view is not harmonious with what the framers of our federal and state constitutions intended when they put these protections into our constitutions, and we so hold.

> [Id. at 1293.]

See also State v. Barkmeyer, 949 A.2d 984, 996 (R.I.) (noting that officer's warrantless entry into home and seizure of evidence, at invitation of private actor who had already found evidence, "requires analysis beyond the law of private search"), cert. denied, 555 U.S. 1071, 129 S. Ct. 740, 172 L. Ed. 2d 729 (2008); State v. Miggler, 419 N.W.2d 81, 84 (Minn. Ct. App. 1988) (distinguishing Jacobsen because search had been conducted in defendant's home and had exceeded scope of private search, among other reasons). The Supreme Court of Washington has also

23

found that the private search doctrine is contrary to the Washington Constitution.  State v. Eisfeldt, 185 P.3d 580, 584-86 (Wash. 2008).

Other courts have permitted warrantless searches of a private home that did not exceed the scope of an earlier private search.  The Fifth Circuit considered events similar to this case in United States v. Bomengo, 580 F.2d 173 (5th Cir. 1978), cert. denied, 439 U.S. 1117, 99 S. Ct. 1022, 59 L. Ed. 2d 75 (1979), a case that preceded Jacobsen.  In Bomengo, an engineer of an apartment complex noticed water leaking from outside the defendant's apartment.  Id. at 174-75.  Someone tried to find the apartment's occupants but did not succeed.  Id. at 175.  The engineer and a security officer for the complex then entered the apartment to fix the leak and assess the damage.  Id. at 175.  While inside, they saw two handguns with attached silencers and called the police.  Ibid.  A police officer entered the apartment, saw the silencers, and left to obtain a search warrant.  Ibid.  The court upheld the officer's actions because they were "confined strictly to the scope of the initial discovery."  Id. at 176.

The Fifth Circuit refined its analysis after Jacobsen.  It declined to extend the private search doctrine in wholesale fashion to searches of private dwellings.  See United States v. Paige, 136 F.3d 1012, 1020 n.11 (5th Cir. 1998).  Instead, the

24

Circuit inquired whether the private party's intrusion into a residence "was reasonably foreseeable," in light of the "activities of the home's occupants or the circumstances within the home at the time of the private search." Id. at 1020. If the private intrusion was reasonably foreseeable, the court explained, "the occupant will no longer possess a reasonable expectation of privacy in the area or thing searched, and the subsequent police search will not trigger the Fourth Amendment." Ibid.; see also United States v. Oliver, 630 F.3d 397, 406-07 (5th Cir.), cert. denied, ___ U.S. ___, 132 S. Ct. 758, 181 L. Ed. 2d 490 (2011) (same).

The Fifth Circuit found no Fourth Amendment violation when it applied the test to the facts before it in Paige, supra. 136 F.3d at 1021. The defendant had hired roofers to repair his roof and had advised them that they could go into the garage if they needed tools or supplies. Ibid. When the workers accidentally damaged the side of the home, it was thus "reasonably foreseeable" for them to look in the garage for replacement materials. Ibid. Once inside, they saw marijuana. Ibid. Under the circumstances, the circuit court concluded that a follow-up examination by an officer called to the scene did not run afoul of the Fourth Amendment. Ibid.

The Eighth Circuit considered Paige's reasonable foreseeability test and "neither adopt[ed] nor reject[ed]" it.

25

See United States v. Miller, 152 F.3d 813, 816 (8th Cir. 1998). The Miller court found that a police search of a patient's room in a treatment facility, which followed a private search, passed muster under both Jacobsen and Paige. Ibid. The court noted that the police search did not exceed the scope of the private search and that the private party's intrusion was reasonably foreseeable. Ibid.[1]

### E.

We add briefly that apartment dwellers do not cede their rights under the Fourth Amendment or the State Constitution to their landlord. A landlord typically has the right to access a tenant's apartment under certain circumstances -- for example, to make repairs and conduct inspections -- provided the landlord gives reasonable notice. See, e.g., N.J.A.C. 5:10-5.1(c). Immediate access "shall be given" "in case of safety or structural emergencies." Ibid. In general, though, a landlord does not have the authority to consent to a search of a tenant's private living space. Chapman v. United States, 365 U.S. 610,

---

[1] We do not consider certain other cases the parties discuss, in which a private actor handed items over to the police after a private search, see, e.g., State v. Moffett, 885 F. Supp. 237, 239 (N.D. Ala. 1995), aff'd, 89 F.3d 855 (11th Cir. 1996), or the police obtained a warrant before searching, see, e.g., State v. Krajeski, 16 P.3d 69, 71 (Wash. Ct. App.), pet. for review denied, 29 P.3d 718 (Wash. 2001).

81 S. Ct. 776, 5 L. Ed. 2d 828 (1961); State v. Coyle, 119 N.J. 194, 215-16 (1990).

IV.

We have serious reservations about extending the private search doctrine to the home. The United States Supreme Court has never applied the doctrine in that setting, and we do not glean from recent decisions that it would allow such an extension. See, e.g., Jardines, supra, ___ U.S. ___, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (emphasizing heightened protection accorded to private home and immediate area surrounding it); see also 1 Wayne LaFave, Search and Seizure, § 1.8(b), at 387 (5th ed. 2012) ("[I]t is to be doubted that if a private person searched the premises of another and then reported to police what he had found (instead of removing the evidence and handing it over to the police), that the police could then make a warrantless entry of those premises and seize the named evidence . . . .").

Relying on the protections in the State Constitution, we conclude that the private search doctrine cannot apply to private dwellings. Absent exigency or some other exception to the warrant requirement, the police must get a warrant to enter a private home and conduct a search, even if a private actor has already searched the area and notified law enforcement.

27

To be sure, whenever residents invite someone into their home, they run the risk that the third party will reveal what they have seen to others. See Jacobsen, supra, 466 U.S. at 117, S. Ct. at 1658, 80 L. Ed. 2d at 96. A landlord, like any other guest, may tell the police about contraband he or she has observed. And the police, in turn, can use that information to apply for a search warrant. Ibid. But that course of events does not create an exception to the warrant requirement.

To hold otherwise would result in a sizeable exception to the warrant requirement and expand the private search doctrine beyond the minimal intrusion it originally sanctioned. It would also ignore the special status of the home under federal and state constitutional law and allow a more substantial invasion of privacy. In short, a private home is not like a package in transit.

We recognize that residents have a reduced expectation of privacy in their home whenever a landlord or guest enters the premises. But residents do not thereby forfeit an expectation of privacy as to the police. In other words, an invitation to a plumber, a dinner guest, or a landlord does not open the door to one's home to a warrantless search by a police officer.[2]

---

[2] In a different context, the Court has found that people retain a reasonable expectation of privacy in certain information they reveal to third-party providers. See Earls, supra, 214 N.J. at

28

The State, though, argues that in a case like this, the police are merely conducting a "confirmatory" search when they repeat the same search a private party has already conducted. But police officers can see and learn far more when they walk through a private home than when they inspect a discrete item delivered by a private party. Here, the police saw details of the interior of a person's residence -- an area normally free from the government's view. See Kyllo v. United States, 533 U.S. 27, 37, 121 S. Ct. 2038, 2045, 150 L. Ed. 2d 94, 104 (2001) ("In the home, our cases show, all details are intimate details, because the entire area is held safe from prying government eyes."). The police also spotted a scale that the landlord had not told them about. Cf. Jacobsen, supra, 466 U.S. at 120, 104 S. Ct. at 1660, 80 L. Ed. 2d at 98 ("[T]he agent . . . learn[ed] nothing that had not previously been learned during the private search."). The search, thus, went beyond simply confirming what the landlord had seen.

The State cannot rely on the plain view doctrine to justify the seizure of the scale. Under that doctrine, the State would have to show that the officer was "lawfully in the viewing

---

588 (cell phone location information); State v. Reid, 194 N.J. 386, 389 (2008) (Internet subscriber information); State v. McAllister, 184 N.J. 17, 19 (2005) (bank records); State v. Mollica, 114 N.J. 329, 344-45 (1989) (hotel-room telephone toll billing records); State v. Hunt, 91 N.J. 338, 345 (1982) (telephone toll billing records).

29

area." Bruzzese, supra, 94 N.J. at 236.  That depends on whether the officer's initial entry into the home was permissible.  Kentucky v. King, ___ U.S. ___, ___, 131 S. Ct. 1849, 1858, 179 L. Ed. 2d 865, 876 (2011) (citing Horton v. California, 496 U.S. 128, 136-40, 110 S. Ct. 2301, 2308-10, 110 L. Ed. 2d 112, 123-25 (1990)).  Without a warrant, the State cannot make that showing or rely on plain view.

The proper course under the State and Federal Constitutions is the simplest and most direct one.  If private parties tell the police about unlawful activities inside a person's home, the police can use that information to establish probable cause and seek a search warrant.  In the time it takes to get the warrant, police officers can secure the apartment or home from the outside, for a reasonable period of time, if reasonably necessary to avoid any tampering with or destruction of evidence.  Illinois v. McArthur, 531 U.S. 326, 334, 121 S. Ct. 946, 951-52, 148 L. Ed. 2d 838, 849 (2001).  But law enforcement cannot accept a landlord's invitation to enter a home without a warrant unless an exception to the warrant requirement applies.

V.

For the reasons discussed above, the third-party intervention or private search doctrine does not exempt law enforcement's initial search of defendant's home from the warrant requirement.  To offer guidance for the future, we

30

repeat that if a landlord relays that he has seen drugs or contraband in an apartment, as happened here, the police can use that information to obtain a search warrant and then conduct a search. If there are exigent circumstances, a warrant is not required. Earls, supra, 214 N.J. at 569.

The State has not argued exigent circumstances here. No one was in the apartment, and the officer on the scene conceded that it was not urgent to search right away. He admitted that there was time to secure the house and seek a warrant.

The trial court found that, after Officer Christie's warrantless entry into the dwelling, co-defendant James validly consented to a full search of the apartment. The later, second search led to the discovery of a loaded handgun, ammunition, materials used to cut and package cocaine, and other items.

We limited the grant of certification in this case to whether the third-party intervention doctrine applies to a warrantless search of a home. 217 N.J. 283. We therefore remand this case to the trial court to evaluate whether the initial unlawful search tainted the later consensual search. See Wong Sun v. United States, 371 U.S. 471, 485, 84 S. Ct. 407, 416, 9 L. Ed. 2d 441, 454 (1963).

Nothing in this opinion is intended to cast doubt on the private search or third-party intervention doctrine in its original form. When the police reexamine property that has been

31

searched by a private actor and presented to law enforcement in a non-residential context, neither the Fourth Amendment nor the State Constitution requires a warrant.  See Jacobsen, supra, 466 U.S. 109, 104 S. Ct. 1652, 80 L. Ed. 2d 85; Burdeau, supra, 256 U.S. 465, 41 S. Ct. 574, 65 L. Ed. 1048.

VI.

For the reasons stated above, the judgment of the Appellate Division is reversed.  The matter is remanded to the trial court for further proceedings consistent with this opinion.


JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in CHIEF JUSTICE RABNER's opinion.  JUDGE CUFF (temporarily assigned) did not participate.

SUPREME COURT OF NEW JERSEY

NO.    A-64                          SEPTEMBER TERM 2013

ON CERTIFICATION TO        Appellate Division, Superior Court


STATE OF NEW JERSEY,

        Plaintiff-Respondent,

              v.

RICKY WRIGHT,

        Defendant-Appellant.


DECIDED            May 19, 2015
              Chief Justice Rabner              PRESIDING
OPINION BY              Chief Justice Rabner
CONCURRING/DISSENTING OPINIONS BY
DISSENTING OPINION BY

| CHECKLIST | REVERSE AND REMAND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUSTICE SOLOMON | X | |
| TOTALS | 6 | |