**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1671-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

LAWRENCE W. LAPCZYNSKI,

    Defendant-Appellant.

_____

> Argued January 6, 2022 – Decided March 9, 2022
>
> Before Judges Alvarez, Mawla, and Mitterhoff.
>
> On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 18-02-0178.
>
> Elizabeth C. Jarit, Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Elizabeth C. Jarit, of counsel and on the briefs).
>
> Lila B. Leonard, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Lila B. Leonard, of counsel and on the brief).

PER CURIAM

After defendant Lawrence Lapczynski's motion to suppress evidence seized without a warrant was denied, he pled guilty to the only charge against him, third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(b)(5)(b). On November 18, 2019, the Law Division judge sentenced him to three days' time served and parole supervision for life, N.J.S.A. 2C:43-6.4. Defendant appeals the denial of the motion. We affirm.

The following is drawn from the testimony and exhibits introduced during the suppression hearing. Before defendant's arrest, he and Justin Obuch had been roommates for approximately seven years, first in an apartment, and then in Obuch's house. Defendant paid Obuch rent and initially lived upstairs. As members of Obuch's family moved in, including his wife and child, defendant relocated to the basement. He shared the common areas of the house, such as the kitchen and the upstairs bathroom. Defendant created office space for himself in the shared basement laundry room and maintained his computers there.

The router for the home internet, listed under Obuch's name, was connected to defendant's desktop computer. Obuch, who worked in IT, used defendant's computer to maintain the internet system and troubleshoot any

problems. Defendant acknowledged leaving his desktop computer screen open, and that others could have accessed the computer.

On the day in question, Obuch went downstairs to work on the internet connection because the home system was down. While making the adjustments, Obuch opened a folder on defendant's screen labeled "pictures." He found a trove of pornographic images of underage adolescents and children, some 1,725 pages in all. Obuch viewed only a few of the photos, called his wife, and immediately called police. When the officers arrived, Obuch led them downstairs to show them the pictures. The two officers asked Obuch to show them what he had seen. After viewing approximately five photographs, they instructed Obuch to stop.

Defendant was away on business that weekend. Obuch could not recall whether he obtained defendant's permission before using his computer on three or four past occasions, including this instance. When Obuch asked the officers how he should explain the fact police had taken defendant's computer and related devices, they told him to make up a story. Defendant, who the motion judge found not credible, claimed Obuch told him the police had arrived unannounced with a warrant. Obuch acknowledged he might have said as much, but because two years had passed, he simply could not remember.

A-1671-19

Police asked defendant to come to the station for questioning upon his return. The record does not indicate whether police transported him or he drove himself. He was not handcuffed. At 9:50 in the morning, Detective George Stilwell of the Middlesex County Prosecutor's Office and Detective Robert Wei of the Piscataway Police Department conducted the recorded interview, which the judge watched during the suppression hearing.

The officers began by reading defendant his Miranda[1] rights, which defendant waived. Stilwell asked defendant about the child pornography on his computer: "it's a matter of, you know, you explaining what it's doing there." Defendant responded: "I would imagine -- I don't want to call it that, but I would call it, you know, teen underage, you know, artistic stuff. And the -- I guess I've got a problem. I guess I -- I (indiscernible) did it for a while." Defendant denied sharing the materials or having "do[ne] anything." Defendant then added, "[i]t's just -- it's a fantasy." Stilwell responded that if defendant "need[ed] some type of help, I mean, that is -- that's the first -- you know, that's the first step."

The officers inquired about websites, forums, and whether others were involved. Stilwell said: "You know, through this, maybe, you know, we can get you some help, maybe. . . . [Y]ou can, you know, seek some help, like that.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

Right now, if -- I'm going to ask you for consent to go through your computers[.]" Stilwell explained the consent would include all of defendant's devices. Stilwell left the room for a few minutes, and upon his return asked whether defendant had ever gotten images from the "dark web," about his high school coaching, and whether he spent "private time" with his nieces and nephews. Defendant insisted his activities were limited to the possession of pornographic material and that it was a "private fetish." He acknowledged that the internet at the home, and the IP address, were under Obuch's name.

Stilwell left the interview room a second time to obtain the consent form. The detective had defendant read the following language out loud before signing the form:

> Having been . . . informed of my constitutional rights, first, that I may require that a search warrant be obtained prior to any search being made; second, that I may refuse to consent to any search; third, that anything which may be found as a result of a search which is subject to seizure and can and will be seized and used against me in a criminal prosecution; fourth, that I may revoke my consent to search at any time; fifth, that I may consult with anyone of my choosing before I make a decision to waive my rights by consenting to this search. I hereby authorize a complete search of the property under my control described as -- listed.

At 10:42 a.m., defendant signed the consent.

A-1671-19

At the suppression hearing, defendant testified he only signed the consent because Obuch told him the police had a warrant. He had therefore assumed signing the form was not important.

Now, on appeal, defendant raises the following points:

POINT I

THE WARRANTLESS SEARCH OF THE DEFENDANT'S PERSONAL COMPUTER BY THE LANDLORD AT THE DIRECTION OF THE POLICE VIOLATED THE FOURTH AMENDMENT AND ARTICLE I, PARAGRAPH 7, REQUIRING SUPPRESSION.

A. The State conducted a warrantless search of [defendant's] personal computer where no exception to the warrant requirement applied.

B. The later-signed consent form did not purge the taint of the unlawful search and seizure.

POINT II

SUPPRESSION IS ALTERNATIVELY REQUIRED BECAUSE THE CONSENT PROVIDED TO CONDUCT A FORENSIC SEARCH OF THE COMPUTER EQUIPMENT WAS NEITHER KNOWING NOR VOLUNTARY WHERE THE POLICE FRAMED THE CONSENT AS A STEP TOWARDS GETTING THE DEFENDANT "HELP" AND WHERE THE DEFENDANT BELIEVED THE POLICE ALREADY HAD A WARRANT TO SEARCH HIS PROPERTY.

6

# I.

Appellate courts reviewing motions to suppress defer to trial courts' factual findings if "supported by sufficient credible evidence in the record." State v. Jessup, 441 N.J. Super. 386, 389 (App. Div. 2015) (quoting State v. Hubbard, 222 N.J. 249, 262 (2015)). But whether those facts "satisfy the applicable legal standard is a question of law subject to plenary review on appeal." Id. at 389-90 (quoting State v. Cleveland, 371 N.J. Super. 286, 295 (App. Div. 2004)). We review legal conclusions de novo. Id. at 390.

Police may only search pursuant to a warrant or an exception to the warrant requirement. State v. DeLuca, 168 N.J. 626, 631 (2001). The State must meet that burden by a preponderance of the evidence. State v. Elders, 192 N.J. 224, 246 (2007). Where unlawful police misconduct occurs, evidence is suppressed. In re J.A., 233 N.J. 432, 446-47 (2018); see also State v. Hamlett, 449 N.J. Super. 159, 176 (App. Div. 2017).

Both the federal and New Jersey constitutions enshrine an objectively reasonable expectation of privacy. See State v. Hinton, 216 N.J. 211, 236 (2013). "[A] policeman does not trespass when he enters the common areas [of a multi-resident dwelling] in discharge of his duties." State v. Smith, 37 N.J. 481, 496 (1962); see also State v. Johnson, 171 N.J. 192, 209 (2002) (Johnson

I) ("none of the occupants [of a multi-occupancy premises] can have a reasonable expectation of privacy in areas that are also used by other occupants.").

Defendant does not challenge the mere presence of the police in the shared laundry room. Instead, he contends his computer's mere presence in the laundry room did not justify police intrusion into its contents. He also contends Obuch had no right to show police the "pictures" folder.

The rule against unreasonable searches and seizures, however, only applies to state action. In re J.A., 233 N.J. at 451-52. A private person acting "as an arm of the police" may be treated as a state actor for constitutional purposes. Id. at 452 (quoting State v. Scrotsky, 39 N.J. 410, 416 (1963)). In contrast, a private person who independently obtains a defendant's property and gives it to police is not a state actor, and such evidence need not be suppressed. Ibid.

The court must exclude evidence obtained by a private party's search and seizure when "the government ha[d] pre[-]knowledge of and yet acquiesce[d] in" a search that the government "could not have undertaken" itself. State v. Sanders, 185 N.J. Super. 258, 265 (App. Div. 1982) (quoting United States v. Clegg, 509 F.2d 605, 609 (5th Cir. 1975)). "[W]here [government] officials

actively participate in a search being conducted by private parties or else stand by watching with approval as the search continues, [government] authorities are clearly implicated in the search and it must comport with [constitutional] requirements." Id. at 266 (quoting United States v. Mekjian, 505 F.2d 1320, 1327 (5th Cir. 1975)).

Further, "the private search doctrine cannot apply to private dwellings." State v. Wright, 221 N.J. 456, 476 (2015). And generally, "a landlord does not have the authority to consent to a search of a tenant's private living space." Ibid. The private search doctrine recognizes the "special status of the home under federal and state constitutional law . . . ." Id. at 477. "If private parties tell the police about unlawful activities inside a person's home, the police can use that information to establish probable cause and seek a search warrant." Id. at 478. "But law enforcement cannot accept a landlord's invitation to enter a home without a warrant unless an exception to the warrant requirement applies." Ibid. However, Wright does not "cast doubt on the private search or third-party intervention doctrine in its original form. When the police reexamine property that has been searched by a private actor and presented to law enforcement in a non-residential context, neither the Fourth Amendment nor the State Constitution requires a warrant." Id. at 479.

Where a private actor performed the initial search, police may perform a subsequent search that "does not exceed the scope of the private search" so long as the police do not violate any constitutional privacy right "that had not already been frustrated as a result of the private conduct."  State v. Shaw, 237 N.J. 588, 608 (2019) (quoting United States v. Jacobsen, 466 U.S. 109, 126 (1984)).

"A co-habitant who possesses common authority over or has a sufficient relationship to the premises or effects sought to be inspected may voluntarily consent to a lawful search."  State v. Lamb, 218 N.J. 300, 315 (2014).

> The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements[,] but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.
>
> [Id. at 316 (quoting United States v. Matlock, 415 U.S. 164, 171 n.7 (1974)).]

Obuch did not function as a state actor by opening the child pornography file and contacting law enforcement.  He wanted to turn responsibility for the images over to police.  The officers did not ask him to open the computer to perform the initial search; defendant allowed Obuch to use the computer.  Police

A-1671-19

viewed no more than the photographs Obuch had already seen. Even if this constituted a search, it did not exceed the boundaries of what Obuch had already observed.

Furthermore, Obuch had sufficient authority over his roommate's computer to consent to the officers' search. Defendant's computer controlled the home's internet, and Obuch had previously accessed it without incident for maintenance. The computer was left open without password protection. Additionally, the folder containing the materials lacked password protection.

Defendant therefore assumed the risk his crime would be discovered. His actions led Obuch to believe he had the right to be in that common area and exercise control over the computer. And it is unsurprising that a person using another's computer would look at the contents.

Defendant and Obuch's relationship went beyond that of landlord and tenant. They had been roommates and friends for years. Defendant kept his computer open, which meant anyone could use it. Because he made the device available to others in the home, defendant had no objectively reasonable expectation of privacy. If such a reasonable expectation of privacy existed, which it did not, the home's other occupants—Obuch specifically—could waive his rights.

11

Wright's restrictions do not apply to this search. Defendant's computer sat in a common space and could be freely accessed by Obuch when necessary. Therefore, it was constitutionally permissible for police to view the photographs Obuch had already seen. The search was lawful.

## II.

Defendant challenges the validity of the consent to search on two grounds. First, he claims the illegal search could not be made lawful by virtue of the later consent. Second, he contends the consent was not knowing or voluntary because the police "framed [it] as a step towards getting the defendant 'help' and where the defendant believed the police already had a warrant to search . . . ." Since we have found that the police constitutionally viewed the contents of the computer, we address only the voluntariness of defendant's written consent.

Consent is a recognized exception to the warrant requirement. See Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973); State v. Coles, 218 N.J. 322, 337 (2014). Consent searches "are afforded a higher level of scrutiny" under New Jersey law than federal law. State v. Carty, 170 N.J. 632, 639 (2002). Namely, the State must show by a preponderance of the evidence that the consenting defendant acted knowingly and voluntarily and "knew that he or she 'had a choice in the matter.'" Ibid. (quoting State v. Johnson, 68 N.J. 349, 354

(1975) (Johnson II)).  Courts must examine the "totality of the circumstances" to determine whether a finding of consent is "supported by sufficient credible evidence in the record."  Shaw, 237 N.J. at 619.  Specifically, the following factors tend to indicate coerced consent:

> (1) that consent was made by an individual already arrested; (2) that consent was obtained despite a denial of guilt; (3) that consent was obtained only after the accused had refused initial requests for consent to search; (4) that consent was given where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered; [and] (5) that consent was given while the defendant was handcuffed.
>
> [State v. Hagans, 233 N.J. 30, 39 (2018) (alteration in original) (quoting State v. King, 44 N.J. 346, 352-53 (1965)).]

In contrast, the following factors tend to indicate that consent was given voluntarily:  "(1) that consent was given where the accused had reason to believe that the police would find no contraband; (2) that the defendant admitted his guilt before consent; [and] (3) that the defendant affirmatively assisted the police officers."  Id. at 39-40 (alteration in original) (quoting King, 44 N.J. at 353).  Both sets of factors are mere "guideposts," and no one factor is dispositive.  Id. at 40.

"[F]alse promises of leniency" that could "overbear a suspect's will" may also indicate coerced consent. State v. L.H., 239 N.J. 22, 44 (2019). The promise must undermine the defendant's ability to choose for himself so as to render his consent involuntary. Id. at 45. Additionally, "[o]nce a search has begun, there is no effective right to refuse. Therefore, consent given after the search has begun is neither voluntary nor meaningful." Hornberger v. Am. Broad. Cos., 351 N.J. Super. 577, 600 (App. Div. 2002).

Defendant's claim the consent was not knowing or voluntary is not supported by the record. Defendant admitted possessing child pornography before Stillwell ever suggested getting "help" for defendant's "problem." In other words, defendant incriminated himself long before the suggestion of getting help, which in turn was made well before defendant signed the consent.

Nor were the officers' statements coercive. It bears noting that the officers did not offer to obtain the help for defendant; they merely suggested he could get help for himself. When asked for written consent, defendant immediately agreed. He knew that police already possessed the damning materials. Additionally, the officers thoroughly reviewed the consent form with defendant, even asking him to read it out loud.

Defendant also contends he only signed the written consent because he believed the police had obtained a warrant. This too lacks support in the record. The judge specifically found defendant incredible when he testified Obuch told him that officers had come with a warrant. Obuch, whom the judge found credible, only recalled that the officers told him he could lie about the reason the devices were missing. Although Obuch said it was possible he told defendant the officers had a warrant, it is wholly speculative to conclude defendant's consent was given under that misapprehension. It seems self-evident that if the officers already had a warrant, they would not have asked defendant for consent.

Thus, the detectives who interviewed defendant did not deceive him about having a warrant or getting him "help" in exchange for the consent to search. There is nothing coercive or deceitful about the circumstances in which defendant signed the written consent. From the inception of the interview, defendant eagerly answered questions and appeared willing to cooperate with the investigation.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

15

A-1671-19